## UNITED STATES v. GOODMAN.
### No. 332.

Circuit Court of Appeals, Second Circuit.
July 21, 1942.

David Haar, of New York City, for appellant.

Harold M. Kennedy, U. S. Atty., of Brooklyn, N. Y. (Vine H. Smith, of Brooklyn, N. Y., of counsel), for appellee.

Before SWAN, CHASE, and FRANK, Circuit Judges.

SWAN, Circuit Judge.

The appellant was tried with one Joseph Einhorn 'under an indictment which charged, in the first count, that they conspired together to violate the Bankruptcy Act, 11 U.S.C.A. § 52, by concealing assets from the trustee in bankruptcy of Finchley Art Shops, Inc., by transferring assets of that corporation in contemplation of its bankruptcy and with intent to defeat the Act, and by concealing, mutilating and falsifying books and records of the bankrupt. Three additional counts charged the commission of the substantive offenses which count one alleged to be the objects of the conspiracy. Einhorn was convicted on all four counts; he has not appealed. Goodman was acquitted on the substantive counts but found guilty of the conspiracy. He was sentenced to imprisonment for one year and four months, and was granted bail pending appeal. His appeal raises primarily the sufficiency of the evidence to support the verdict and judgment. It attacks also the conduct of the trial in the admission of certain evidence and the refusal of requested instructions with respect to such evidence.

The trial was lengthy, and the record is voluminous—nearly 2,000 typed pages. Examination of the record has been particularly laborious because the court has received little assistance from the government's brief, due to the fact that trial counsel was unavailable and the able appellate counsel was allowed only a very short time for preparation in order that the appeal might be heard at the present term.

The bankrupt, Finchley Art Shops, Inc., which for brevity will be referred to as Finchley, was engaged in the manufacture and sale of upholstered furniture. It was organized in the early summer of 1936 to take over the business of Modern Upholstery Company, a partnership composed of the defendant Einhorn and one Geist. Einhorn became president, and Geist secretary-treasurer of the corporation, and at the start, at least, they were its only stockholders. Throughout its corporate life Finchley had difficulty in finding cash or credit sufficient for its business; it made a practice of discounting accounts receivable and customers' notes and was constantly in debt for borrowed money; it often pledged accounts receivable to obtain credit for the purchase of materials. In December, 1936, its premises were burned out and practically all merchandise on hand was destroyed or damaged. The insurance companies settled the loss on policies of $20,000 for $17,000. The corporation resumed business in new quarters and continued to live from hand to mouth until an involuntary petition in bankruptcy was filed against it on June 3, 1937. Adjudication followed in July and a trustee in bankruptcy was appointed and qualified in August, 1937. A number of transactions as to which testimony was adduced had not been entered on its books of account, and numerous checks which should have been preserved as cancelled vouchers were missing. The foregoing facts, we believe, are not disputed.

We turn now to evidence bearing on the relationship of Goodman to Einhorn and to Finchley. Goodman says he first met Einhorn in 1935. They apparently became friendly. Goodman gave Einhorn's partnership some beneficial advice about a business transaction with Emerson Steu-

ben Company, and thereafter, at Goodman's request, his father was taken on as an employee of the partnership and its successor, Finchley. Goodman introduced Einhorn to Harry Golding of Golding Brothers Company, Inc., jobbers of furniture fabrics, and the partnership became a small-scale customer. After Finchley was organized, it succeeded the partnership as a customer of Golding Brothers Company. Early in 1936 Goodman entered the employ of Golding Brothers Company and soon became its credit manager, a position he continued to hold until June, 1938. There was testimony by Harry Golding that he instructed Goodman not to extend open credit to Finchley beyond $150; any further credit was to be secured by assignment of accounts receivable. Despite these instructions, when the fire occurred in December, 1936, Finchley was indebted to Golding Brothers Company for more than $15,000, of which only $9,000 was secured by assigned accounts. In April. 1937, the indebtedness had risen to some $26,000 and at the date of bankruptcy it was slightly less than $22,000. There is some evidence that goods delivered after the fire were sent under a consignment agreement dated December 28, 1936, of which more will be said later.

When Harry Golding learned of the fire he told Goodman to obtain from Finchley an assignment of the fire insurance claim. This he did; but, contrary to instructions, if the jury believed Golding's testimony, he failed to notify the insurance companies of the assignment, giving to Golding as a reason: "I was afraid I would hurt Finchley's credit." After Finchley had assigned the insurance to Golding Brothers Company, it made a second assignment of part of the insurance to City Industrial Corporation ("C. I. C.") as security for a loan. Goodman had notice of this transaction before the loan was made, but he did not inform Brendel of C. I. C. that Golding Brothers Company had any interest in the insurance; nor did he give any such information to the insurance brokers through whom the loss was adjusted, although he talked with Mr. Saperstein after the assignment to the Golding Company had been executed. Saperstein had been notified of the assignment to C. I. C. The relations between Finchley and C. I. C. were not confined to the above mentioned loan secured by insurance. As early as October 1936 C. I. C. began to discount accounts receivable for Finchley. Goodman was instrumental in inducing them so to do by representing that Golding Brothers Company was extending "a credit of about $20,000, and he felt satisfied the way operations were going on over there." C. I. C. continued to make loans to Finchley on assigned receivables until some time in the spring of 1937, and Brendel testified that usually when a new loan was to be made he would telephone Goodman and ask his opinion of the situation. Goodman also asked Braverman to sell Finchley goods on credit. He even guaranteed payment of accounts pledged to the Royal Industrial Bank when a question arose as to their authenticity. How closely he kept in touch with Finchley's business is shown by the testimony of Miss Einhorn, the bookkeeper. He telephoned her almost daily to inquire about money coming in, new accounts, etc. He gave her instructions as to names to enter on the schedule of accounts assigned to Royal Industrial Bank. She testified that when she told him some of them were accounts upon which no deliveries had been made, he told her that it would be all right to put them in the schedule. She testified that Einhorn had told her to take instructions from Mr. Goodman, and she did so. There was testimony that the faces of numerous checks of Finchley were in Goodman's handwriting. A number of checks drawn to cash were endorsed by him and deposited in his personal account. Some Finchley checks were used by him to pay personal bills. In one such case, the payee, Huller, asked him about the check, "and he said it was all right because he was interested in that concern, something like that." In defense Goodman testified that all the checks which bore his endorsement or which he had used for personal bills were given him in exchange for cash or in repayment of money he had loaned to Finchley, and that his only interest in that corporation was to develop it into a better customer for Golding Brothers Company. But the jury was not obliged to accept these explanations. On cross examination of Michael Popper, called as a witness for defendant Einhorn, counsel for Goodman brought out that at various times Einhorn had stated that Goodman was a partner in Finchley and at other times had denied it. It was for the jury to determine to what character of interest Goodman referred in informing Huller that he was "interested" in Finchley.

Goodman's knowledge of Finchley's precarious financial condition may be inferred not only from his familiarity with its books and business methods but also from other testimony. Kohler made an audit for April, 1937, which showed insolvency to the extent of nearly $30,000. He says he told Goodman this about May 15th. On a Saturday toward the end of May, Goodman telephoned the bookkeeper to pick out the cancelled checks endorsed by him and set them aside. She did so, and left them on the desk in the office. She never saw them again. On June 1, 1937, Goodman sent a truckman to Finchley to cart away goods which he contends belonged to Golding Brothers Company under the consignment agreement dated December 28, 1936. Assuming this agreement was not antedated but was executed on the date it bore, there is evidence that the parties never operated under it. Miss Einhorn testified that the books of Finchley did not show any invoices on consignment. Miss Henschel, Goodman's former secretary, testified that the legend "consigned pursuant to consignment agreement of December 28, 1936," which appeared on certain invoices in evidence, had been typed in by her, pursuant to Goodman's instructions, a few days before the bankruptcy. Harry Golding says that he knew nothing about the consignment agreement until Goodman reported about the return of the merchandise.

In April, 1937, Benchley Upholstery Company, the so-called subsidiary of Finchley, was organized under the laws of Connecticut and started business in Waterbury, Conn. Goodman went to Waterbury and addressed Benchley's employees. Finchley transferred cash and property to Benchley without any record thereof being entered in Finchley's books.

The foregoing is by no means all the evidence bearing on the charge of conspiracy but it will suffice for our discussion. The indictment charged that between January 1, 1936, and the date of the indictment, May 2, 1939, Einhorn and Goodman conspired to conceal assets of the bankrupt estate, to transfer assets with intent to defeat the Act, and to falsify and mutilate books and records. That such things were done is plain; whether they were done with the necessary criminal intent was for the jury to determine. That Einhorn and Goodman acted in concert in procuring merchandise and money for Finchley cannot be doubted. If the jury believed Goodman's explanation that he was merely trying to build up Golding Brothers' customer, his assistance of Einhorn was innocent. But it was not impossible for the jury to find that he was actuated by an improper motive. His intervention in the affairs of Finchley went far beyond what the credit manager of a creditor would normally do in protecting an account. He personally obtained money and checks from Finchley, which were used for his own benefit. Whether these sums were in repayment of loans was for the jury to say. Finchley's books did not show such loans by him, except perhaps in one instance. From a careful perusal of the record we cannot say that the jury's verdict is unsupportable. If there be inconsistency in acquitting Goodman on the substantive counts while convicting him of the conspiracy such inconsistency is immaterial as to the count on which he was convicted. Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161; Carroll v. United States, 2 Cir., 16 F.2d 951, 954, certiorari denied 273 U.S. 763, 47 S.Ct. 477, 71 L.Ed. 880. Nor need the overt acts alleged be unlawful in themselves. Pierce v. United States, 252 U.S. 239, 244, 40 S.Ct. 205, 64 L.Ed. 542; Goldman v. United States, 245 U.S. 474, 477, 38 S.Ct. 166, 62 L.Ed. 410; Davis v. United States, 5 Cir., 86 F.2d 45, 46, certiorari denied 300 U.S. 657, 57 S.Ct. 433, 81 L.Ed. 867; Luxenberg v. United States, 4 Cir., 45 F.2d 497, 498, certiorari denied 283 U.S. 820, 51 S.Ct. 345, 75 L.Ed. 1436.

We pass now to consideration of errors assigned to the admission of evidence and the refusal of requested instructions in respect to it. The challenged evidence consists, in part of testimony given by Harry Golding and H. G. Robinson, an F. B. I. agent, concerning statements made to them, respectively, by Einhorn out of the presence of Goodman and after the date of the bankruptcy adjudication, and, in part of depositions and an affidavit by Einhorn. His depositions were taken in a 21a examination and at an adjourned first meeting of creditors; his affidavit was sworn to November 17, 1937. To all of this evidence the appellant interposed objections which were overruled. In substance the challenged evidence was to the effect that Einhorn stated that Goodman was a partner in his business, and he had delivered to Goodman the certificates of Finchley stock to be divided into thirds, and Good-

man had never returned them. The trial judge explained to the jury that statements by Einhorn out of the presence of Goodman could not be used to prove the conspiracy, but, if a conspiracy be established, then a statement by any one of the conspirators was binding upon all, provided it was made in pursuance of and for the purpose of accomplishing the object of the conspiracy. He told the jury to determine when the conspiracy ended, and if it ended before Einhorn gave his depositions and affidavit or made the statements testified to by the witnesses, then they would simply bind him and not Goodman; and that they could not be used against Goodman in considering the substantive counts. He declined to give requested instructions that Einhorn's statements could not be considered in any way in determining Goodman's guilt or innocence.

In discussing the evidence in the prior portion of this opinion, we made no reference to any evidence admitted over the appellant's objection, and we found the evidence sufficient to support the jury's verdict. The indictment charged that the conspiracy continued beyond the filing of the petition in bankruptcy, as it well might where its object was to conceal assets of a bankrupt's estate. As an abstract legal proposition we think that the charge of the court as to the conditions under which a statement by one conspirator may bind the others was correct.* The theory upon which such declarations are admitted is well expounded in Van Riper v. United States, 2 Cir., 13 F.2d 961, 967. It is that what one does pursuant to their common purpose, all do. But as there pointed out, this theory shows that "merely narrative declarations" are excluded. To be admissible against others than the declarant, the declaration must not only be made while the conspiracy is pending but must also be "in furtherance of its object." Logan v. United States, 144 U.S. 263, 309, 12 S.Ct. 617, 632, 36 L.Ed. 429; Brown v. United States, 150 U.S. 93, 98, 14 S.Ct. 37, 37 L.Ed. 1010; Tofanelli v. United States, 9 Cir., 28 F.2d 581, 582; Romeo v. United States, 9 Cir., 23 F.2d 551, 553; Holt v. United States, 10 Cir., 94 F.2d 90, 93. Einhorn's statements that Goodman had been his partner in the bankrupt's business were not made to procure goods or money for his corporation. They were merely narrative declarations of a past fact. We are unable to imagine any way in which they could have furthered the objects of a conspiracy to conceal assets, transfer assets or falsify books. Nor does the government's brief suggest any or attempt to answer the appellant's argument on this point. We conclude that it was error to admit such statements as against the appellant, and we cannot say that such evidence was non-prejudicial. Whether they were partners in a criminal effort to defeat the Bankruptcy Act, 11 U.S.C.A. § 1 et seq., was a close question under the competent evidence. The incompetent evidence, if credited by the jury, made them partners in the business and may well have influenced the jury in finding them partners in crime. The fact that Goodman was acquitted on the substantive counts, in respect to which the jury was instructed not to consider Einhorn's declarations, tends to support this supposition.

Accordingly the judgment must be reversed and the cause remanded. So ordered.

---

* Whether it was too favorable to the appellant in respect to the substantive counts, as the Government contends, we need not consider.