**UNITED STATES, Appellee,**

v.

**Orlando DELLI PAOLI, Appellant.**

**No. 186, Docket 23436.**

United States Court of Appeals
Second Circuit.

Argued Nov. 17, 1955.

Decided Jan. 10, 1956.

Writ of Certiorari Granted
March 26, 1956.

See 76 S.Ct. 544.

Daniel H. Greenberg, New York City,
for appellant.

Peter M. Brown, Paul W. Williams, U.
S. Attys. for the Southern Dist. of New
York, New York City, for appellee.

**320**

Before HAND, FRANK and MEDINA, Circuit Judges.

HAND, Circuit Judge.

The defendant, Delli Paoli, appeals from a judgment convicting himself and four others after verdict by a jury on an indictment for conspiring to sell, and for selling, illicit alcohol.[1] The conspiracy charged was, and the evidence tended to show, that three of the five accused, Delli Paoli, Margiasso and Pierro, bought a garage in Harding Park, a suburb of New York, which they used for the storage of illicit alcohol. The windows were covered over, the door was locked, and the alcohol, loaded in cartons on a "Diamond T" truck, was from time to time brought to the garage where it was stored, awaiting sale. The practice was for a buyer to drive to a "service station" on Bruckner Boulevard, also on the outskirts of the city, where Margiasso would get into the buyer's car, drive it to the garage, fill the order from the alcohol stored in the garage, and drive it back to the "service station" where the buyer, who had meanwhile been waiting, would pay the price and accept delivery. The appellant does not dispute that there was evidence sufficient to support a verdict against the other four defendants, but he denies that there was enough to connect him with the venture; and he also complains of the admission in evidence of a confession of one of the defendants, Whitley, who like King, appears to have had no part in the enterprise except as a buyer.

The evidence connecting Delli Paoli with the conspiracy was in substance as follows. He had already been an associate of Margiasso and Pierro for some time before December, 1949, when with Pierro he inspected the garage that was later used as the storehouse. Later in that month, when Pierro began to negotiate with the owner of the garage, Delli Paoli and Margiasso were both with him. He at times rode in the "Diamond T" truck that carried the cartons of liquor for storage in the garage. (Incidentally the truck was registered in a false name.) In 1951, two years after the business began, on one or two occasions he was at the "service station" which was the place of delivery and talked with King or Whitley while Margiasso drove their cars to the garage, filled them with alcohol and delivered them so laden back to the buyer. Not only was all this enough to connect him with the business, but the jurors could hardly have failed to find that he was in the enterprise. The whole business was illegal and carried on surreptitiously; and the possibility that unless he were a party to the venture, Pierro and Margiasso would have associated him to the extent we have mentioned is too remote for serious discussion.

The other point is the admission of Whitley's written confession, which was given after his arrest. The purport of this was that Whitley began to buy illicit alcohol in November, 1949, from an Italian, named "Tony." This continued until the summer of 1950 when "Tony" substituted as the seller another Italian, named "Carl," who in the summer of 1951 introduced him to Delli Paoli, known as "Bobby." Delli Paoli later introduced him to Margiasso but told him not to pay Margiasso for any alcohol that he bought. Until about November, 1951, the practice had been for Whitley to drive his car either to 138th Street and Bruckner Boulevard, or to the corner of Soundview Avenue or Bruckner Boulevard, where he would meet one or the other of these two men, who would drive away with the car and come back with the alcohol in about twenty minutes. During the last two months of 1951, the rendezvous had been the "service station" on Bruckner Boulevard that we have mentioned. Judge Dawson admitted this confession against Whitley only with the most particular and scrupulous admonitions that the jury should disabuse their minds of it in deciding the guilt of the other four. At one stage of

1. § 371, Title 18; §§ 2803(a), 2806(e), 2913, Title 26, U.S.Code.

the protracted discussion about its admission Delli Paoli's lawyer asked, though somewhat obliquely, that all reference to his client should be "deleted," and at the close of the evidence he moved for a mistrial among other reasons because the confession was "admitted into" (sic) "evidence without the deletion of the names."

■ Beginning with Nash v. United States, 2 Cir., 54 F.2d 1006, nearly twenty-five years ago, we have recognized without reserve that after the end of any concerted action to admit in evidence the declaration of one of several defendants accused of conspiracy is in effect to accept hearsay against all but the declarant.[2] The reason for admitting such evidence while the defendants are acting in concert is that the declarations are considered as themselves steps in the execution of the common purposes and that the acts of one are the acts of all. In Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790, it was because the Supreme Court held that the purposes of the conspiracy had ended that the declaration was held incompetent. However, even so, if the declarant had been tried along with Krulewitch, the question would have arisen whether an admonition such as was given in the case at bar would have made her declaration, or any such declarations, "admissible as exceptions to the hearsay rule." 336 U.S. at page 443, 69 S.Ct. at page 718. Undoubtedly the ability to introduce them adds to the inducement to sweep all those concerned in a venture into one indictment; and possibly it would have been better, had the price of the admissibility of separate declarations, made after the event, been a separate trial of the declarant; for it is indeed very hard to believe that a jury will, or for that matter can, in practice observe the admonition. Possibly it would be extreme to say that nobody can ever so far control his reasoning that he will not in some measure base his conclusion upon a part of the relevant evidence before him, which he has been told to disregard; but at least it is true that relatively few persons have any such power, involving as it does a violence to all our habitual ways of thinking. Hence, although the doctrine is well settled that such declarations are competent, provided the placebo goes along with them, there is no reason why this should be the final measure of protection granted to the defendants other than the declarant. Unhappily, it is extremely difficult to escape the dilemma that must always arise on such occasions, because on the one hand the declaration should remain unimpaired as against the declarant, and yet it must be in some measure mutilated in favor of the others. At best the solution is especially a matter for the exercise of discretion by the trial judge.

■ In the case at bar it appears to us plain that the expedient suggested by the appellant: i. e. to black out the names of Delli Paoli and Margiasso would have been futile. From the declaration it would then have appeared that two anonymous persons had been previously selling Whitley illicit alcohol for a month or more at the "service station" which the other witnesses had identified Margiasso and Delli Paoli as frequenting; that Whitley had met one of this unnamed couple on the night of the arrest at the "service station," who had driven Whitley's car away and brought it back filled with alcohol, and that after Whitley's arrest the other one had appeared. Read upon the other evidence of the prosecution's witnesses that had connected Delli Paoli with Margiasso and Pierro at the "service station" and elsewhere, there could not have been the slightest doubt as to whose names had been blacked out; and, even if there had been, the blacking out itself would have not only laid the doubt, but underscored the answer. Therefore, without passing on the question whether a judge

---

**2.** United States v. Gottfried, 2 Cir., 165 F.2d 360, 367; United States v. Leviton, 2 Cir., 193 F.2d 848, 855, 856; United States v. Kelinson, 2 Cir., 205 F.2d 600.

than give the admonition, we are satisfied that the case at bar was not one in which the only action suggested to him may at times be called upon to do more would have been of any service to Delli Paoli.

Judgment affirmed.

MEDINA, Circuit Judge (concurring).

Appellate courts as a rule review only judgments of conviction in criminal cases; they have nothing to do with the records of cases where the jury's verdict was one of acquittal. Perhaps this is one of the reasons why statements are occasionally found in the opinions of courts of review to the effect that juries may not or perhaps cannot follow instructions, especially in matters concerning: the failure of a defendant to testify in his own defense, proof on cross-examination that a defendant who did take the stand had previously exercised his constitutional privilege against self-incrimination, and, as here, the use of the confession of an alleged co-conspirator. It is my belief that jurors generally can and do follow instructions conscientiously, in these matters as well as others.

The question before us, on the phase of this case relating to Whitley's confession, is whether or not there was any abuse of discretion on the part of Judge Dawson. It was long since decided that, in a joint conspiracy trial, an alleged confession after the event by one of the co-conspirators need not necessarily be rejected. The text of the alleged confession, the proofs adduced against the various defendants, comments or lack of comments by the prosecutor, and, especially, the instructions by the trial judge to the jury, constitute the background against which we must decide whether or not the defendant has had a fair trial. Here every element indicates that there was no infringement of defendant's rights. There is nothing to show, nor is it even suggested, that Whitley's confession was offered in evidence for any purpose other than its legitimate bearing on the question of Whitley's guilt or innocence; and the instructions on the subject were emphatic and clear. There was no abuse of discretion by the trial judge. Nor am I able to discover any basis for supposing that the jury did not follow his instructions.

FRANK, Circuit Judge (dissenting).

Five defendants, including Paoli, were indicted, tried together, and convicted. Paoli alone has appealed. The evidence against the other four clearly established conspiracy among them. But the evidence against Paoli—aside from Whitley's confession—was by no means overwhelming. Most of this evidence consists of testimony which, if believed, shows that he fraternized with the other defendants.[1] From this testimony it could easily be inferred that he knew of the conspiracy. The further inference that he must have been a party to the venture, while not irrational, is not at all irresistible, unless one is prepared to say that every person intimate with conspirators and aware of their conspiracy necessarily becomes a conspirator. Had not the confession been received in evidence, no one could have been astonished if the jury had acquitted Paoli. For, absent the confession, there is no evidence directly connecting him with the conspiracy. Indeed, the government's brief, in justifying his conviction, argues that "When a conspiracy is established, slight evidence connecting a defendant may be substantial."

But the jury saw and read Whitley's signed and sworn confession (which is printed in full as an Appendix to this opinion). It contained statements that

---

1. The government puts much stress on testimony about Paoli's alleged attempted flight when government agents sought to arrest him. As narrated in the government's brief, this testimony was as follows: "One of the agents approached Paoli's car and started to speak to him. Immediately he backed up his Cadillac in an effort to gain access to the street. To prevent his escape, a government agent drove his car up to the rear of Paoli's automobile. Seconds later, a police cruiser pulled up to the left of his automobile. He was then arrested." This testimony is surely not very strong evidence of attempted flight.

Paoli took orders for the alcohol, delivered it, and received cash therefor. The confession thus damningly implicated Paoli.

When Whitley gave this confession, the conspiracy had ended; it could not conceivably have furthered the conspiracy.[2] If, then, Whitley had not been on trial with Paoli, the confession would have been inadmissible hearsay as to Paoli. So Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790, plainly teaches.[3]

There are no differences between Krulewitch and the instant case except that Whitley was a co-defendant of Paoli and that the trial judge admonished the jury not to consider Whitley's confession as proving the guilt of the other defendants, including Paoli. But those differences can have no practical significance. For Judge Hand concedes that, almost certainly, the cautionary admonition had no effect on the jury,[4] a concession in accord with Mr. Justice Jackson's comment in Krulewitch, 336 U.S. at page 453, 69 S.Ct. at page 723: "The naive assumption that prejudicial effects can be overcome by instructions to the jury * * *, all practising lawyers know to be unmitigated fiction. See Skidmore v. Baltimore & Ohio R. Co., 2 Cir., 167 F.2d

54." It follows, I think, that Krulewitch governs here, and that accordingly the reception of the confession was, as to Paoli, reversible error. Indeed, the harm here exceeded that in Krulewitch: There the objectionable out-of-court statement was oral; here it was type-written.[5]

In 1925, the Conference of Senior Judges, with Chief Justice Taft presiding, reported that " 'the rules of evidence in conspiracy trials make them most difficult to try without prejudice to [the] innocent.' " [6] Among those rules was the rule which my colleagues apply in this case and which, I think, Krulewitch destroyed. That rule, as Judge Hand says, had the support of many precedents, especially in this Circuit.[7] But in criminal actions, where life or liberty is at stake, courts should not adhere to precedents unjust to the accused. It is never too late to mend. See concurring opinion in Scully v. United States, 2 Cir., 225 F.2d 113, 118. So no one should lament the destruction wrought by Krulewitch. For, even among those (like Judge Hand and me) who would like to have legislation enacted wiping out or drastically modifying the hearsay rule in civil actions, there are few who do not agree that, for the

2. See United States v. Goodman, 2 Cir., 129 F.2d 1009, 1013; A. L. I. Model Code of Evidence Rule 508(b); Uniform Rules of Evidence Rule 63(9).

3. In Krulewitch v. United States, 336 U. S. 440, 69 S.Ct. 716, the objectionable hearsay statement evidenced an intention to conceal the alleged conspiracy which had ended; it could therefore be argued, without utter implausibility, that the statement was in furtherance of the conspiracy's objectives. But it cannot possibly be said that here Whitley's confession of the previous existence of the conspiracy was in aid of its objectives.

4. In earlier opinions on this subject, Judge Hand expressed the same view. Thus in United States v. Gottfried, 2 Cir., 165 F.2d 360, 367, he said: "Nobody can indeed fail to doubt whether the caution is effective, or whether usually the practical result is not to let in hearsay." In Nash v. United States, 2 Cir., 54 F.2d 1006, 1007 he wrote of "the recommendation to the jury of a mental gymnastic

which is beyond, not only their powers, but anybody's else."

5. Often when, in civil suits, hearsay is received under an exception to the hearsay-rule, the opponent has the opportunity to call to the stand and examine the person said to have made the out-of-court statement. But here the statement was that of Paoli's co-defendant who, relying on his privilege, did not take the stand and who therefore could not be called as a witness by Paoli.

6. Quoted in Mr. Justice Jackson's concurring opinion in Krulewitch, 336 U.S. at page 446, note 2, 69 S.Ct. at page 719. That concurring opinion describes other injustices in federal criminal conspiracy trials as now conducted.

7. Dissenting in United States v. Leviton, 2 Cir., 193 F.2d 848, at pages 863–864, I criticized those precedents. Later, in a dictum in United States v. Kelinson, 2 Cir., 205 F.2d 600, 601, I acquiesced in them. *Mea culpa.*

**324**

most part, it should be retained in criminal actions because it importantly serves the interest of justice to those accused of crime.[8]

In the light of Krulewitch, I think something like the following is the correct rule: When several defendants are on trial for criminal conspiracy, if the government seeks to put in evidence an out-of-court statement by one defendant which is hearsay as to the others (i. e., an out-of-court statement made after the conspiracy has terminated), then

(a) unless all references to the other defendants can be effectively deleted (so that the statement will contain no hint of the others' guilt) and unless those references are deleted,

(b) the trial judge must (1) refuse to admit the statement or (2) sever the trial of those other defendants.

Paoli's counsel objected to the admission of the confession. When the trial judge overruled that objection, Paoli's counsel requested the deletion of Paoli's name. I agree with Judge Hand that the deletion would not have achieved the purpose of that request. But the error in admitting this damaging evidence remains.

Had Whitley's confession been excluded, the case against Paoli would have turned entirely on the jury's belief in the credibility of testimony given by government witnesses which, as already noted, was not overwhelming in showing guilt. But that testimony had the powerful backing of the Whitley confession.[9] It cannot, therefore, be said that, aside from the confession, the evidence of Paoli's guilt is so strong that the error in admitting the confession was harmless. That is, the evidence against Paoli

is not so strong that, from reading the printed record alone, we can have a sure conviction that the confession "did not influence the jury, or had but very slight effect."[10] This is not a case where the "record fairly shrieks the guilt"[11] of Paoli. "We cannot say that the erroneous admission of the hearsay declaration may not have been the weight that tipped the scales * * *."[12]

The government argues that its case against Whitley would have been severely prejudiced by exclusion of his confession. The answer is that the government could have asked that Whitley be tried separately. He has now been convicted after a trial in which doubtless his confession counted heavily against him. If, as I think we should do, we were to reverse and remand as to Paoli, of course, at his new trial Whitley's confession would be excluded.

## Appendix

Whitley's confession reads as follows:

UNITED STATES OF AMERICA,
SOUTHERN JUDICIAL DISTRICT OF NEW YORK,
*ss.:*

JAMES WHITLEY, being duly sworn, deposes and says:

I reside at 65 West 133rd Street, Apartment 4E, New York, N. Y. I make this statement in the presence of my attorney, Mr. Bertram J. Adams of 299 Broadway, New York, N. Y., after being fully advised that under the Constitution of the United States I have the privilege and right of not saying anything at all; that if I answer any question anything I say could be used against me in any criminal proceeding. Being fully aware of my rights, I make this statement of my

8. See, e. g., the English Evidence Act of 1938, 1 & 2 Geo. 6, C. 28, § 1, modifying the hearsay rule: It is explicitly restricted to civil actions.

9. Cf. Glasser v. United States, 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680: "Clearly the statements were damaging. Other evidence tending to connect Glasser with the conspiracy is rather meagre by comparison."

10. Kotteakos v. United States, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 1248, 90 L. Ed. 1557.

11. Lutwak v. United States, 344 U.S. 604, at page 619, 73 S.Ct. 481, at page 490, 97 L.Ed. 593.

12. Krulewitch v. United States, 336 U.S. at page 445, 69 S.Ct. at page 719.

own free will to Special Investigators Albert Miller and William Greenberg in the office of the Alcohol and Tobacco Tax Division, 143 Liberty Street, New York, N. Y.

Sometime around Thanksgiving of 1949, a friend of mine introduced me to a man known to me as Tony. This man asked me if I wanted to buy some alcohol and I told him I did. The meeting occurred on 126th Street in Harlem. The man then told me to meet him the next day at a candy store on the south side of 119th Street, just east of First Avenue. When I got there, Tony introduced me to a man whose name I do not know. This man told me to meet him that night on 100th Street and Second Avenue. I met him there. He took my car and drove away. A little while later he came back and told me that the car was parked on 103rd Street and Second Avenue. I had purchased two 5-gallon cans of alcohol on that occasion and paid him just before he drove away in my car. Thereafter, I would meet this man around the candy store about twice a week and the same procedure would be followed. This continued until about June or July of 1950.

Tony was about 5′ 4″ in height, about 55 years of age, had a dark complexion and stocky build and, I believe, had brown eyes. He was apparently of Italian extraction. The other man who sold me the alcohol was apparently also of Italian descent, and he had a dark complexion. He spoke in broken English. He had black hair and was about 27 or 28 years of age and was about 5′ 9″ in height. (Sometime in 1950, Investigator Whited of the Alcohol and Tobacco Tax Division asked me about him and showed me his picture.)

At about that time, this man sent me to Carl. He introduced Carl to me and told me that Carl would take care of me from then on. I would meet Carl on Second Avenue between 121st Street and 122nd Street in a seafood restaurant and would purchase the alcohol from him.

Carl is about 5′ 10″ in height, has blond hair, blue eyes, light complexion and is about 30 years of age. He is apparently of Italian descent. He is about 160 pounds. Carl would usually come to my home to see me and ask me if I needed anything.

Just before Carl went to jail in 1950, he introduced me to Bobby. I have been shown a photograph bearing ATU 3643 N.Y. dated 12/29/51 of Orlandi Delli Paoli, and I identify it as that of the man known to me as Bobby. This was sometime in the summer of 1951. Bobby would come to my house to see me. If I placed an order with him he would set the date and the time for seven or eight o'clock in the evening when I was to pick up the alcohol. The first time I met him at 138th Street and Bruckner Boulevard, in the Bronx. He took my car and was gone about one-half hour and then returned with the alcohol. The second time I met him on the corner of Bruckner Boulevard and Soundview Avenue. From then on he would alternate the procedure: I would meet him one night on 138th Street and the next time at Soundview Avenue.

About two months ago, I began meeting Bobby at the Shell gasoline station known as the Bronx River Service Station on Bruckner Boulevard just past the bridge crossing over to Bronx River. I would usually leave my car parked on the street near the gas station and meet Bobby outside of the gas station. He told me not to go into the gas station as the attendant might not like it.

About a month ago, Bobby introduced me to another man whose name I do not know. I have been shown a photograph marked ATU 3642 N.Y., dated 12/29/51 of Carmine Margiasso, and identify it as that of the man to whom Bobby introduced me. Bobby also told me that if he was not present when I met Margiasso, I was not to give Margiasso any money but was to pay him (Bobby) the next time I saw him. Margiasso also followed the same procedure: He would take my car, would be gone about 20 minutes, and then return with the alcohol. Margiasso picked up my car about four times.

My purchases from Bobby would consist of two or three 5-gallon cans of al-

cohol at a time and were made once or twice a week. The last two times I paid Bobby $38 a can.

On the evening of Friday, December 28, 1951, I had ordered two cans, and when Margiasso took my car I waited in the lunch room near the gas station. When I thought it was time for Margiasso to return, I went over to the gas station and waited in the office after purchasing a package of cigarettes. Two officers who were Federal officers came in and placed me and William Hudson under arrest. Shortly after that happened, Bobby drove up and was arrested by the Federal officers.

I have read the above statement consisting of three pages and it is true to the best of my knowledge and belief.

(Signed) JAMES WHITLEY
James Whitley

Sworn to before me
this 5th day of January 1952.
(Signed) WILLIAM GREENBERG
William Greenberg, Spec. Inv.
WITNESS:
(Signed) ALBERT MILLER
Albert Miller, Spec. Inv.