**UNITED STATES of America, Appellee,**

v.

**Fred EUBANKS, Eugene Martinez, Leroy Jones, Henry D. Yanez, Appellants.**

**Nos. 77–3919, 77–3955, 77–4003 and 78–1032.**

United States Court of Appeals, Ninth Circuit.

Feb. 2, 1979.

As Amended March 12, 1979.

515

Robert J. Hirsh (argued), of Hirsh & Shiner, John E. Lindberg (argued), George Haskel Curtis (argued), of Curtis & Cunningham, Tucson, Ariz., Michael D. Kimerer (argued), Henry, Wallach, Kimerer & LaVelle, Phoenix, Ariz., for appellants.

Stephen M. Dichter, Asst. U. S. Atty. (argued), Tucson, Ariz., for appellee.

**516**

Before ELY and HUFSTEDLER, Circuit Judges, and KRAFT,* District Judge.

PER CURIAM:

Appellants and three others were indicted on charges of conspiracy to distribute heroin and to possess heroin with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846. Appellants were jointly tried and convicted by a jury. On appeal, they raise numerous claims of error, the most serious of which is founded on the alleged bias of one of the trial jurors. It is unnecessary for us to discuss all the issues raised by appellants, because we hold that the district court erred in denying appellant's motion for a new trial based on juror bias. We do consider appellants' claims of error based on the refusal of certain jury instructions and the admission of hearsay testimony, because they are likely to arise again on retrial.

I

Appellants argue that the district court erred by denying their motion for a new trial because of the alleged bias of juror Collins. After the conclusion of the trial, appellants' counsel learned that juror Collins had two sons who were serving long prison terms for murder and robbery. Both of the juror's sons were heroin users and their crimes had been committed in an effort to acquire additional heroin.

Defense counsel had been unaware of Collins' background at the time of jury se-

lection. Collins had indicated on one of his juror qualification forms that he was married and had no children. The trial judge, who conducted the voir dire, had asked prospective jurors: "have any of you or members of your immediate families ever been personally interested in the defense of a criminal case or a witness for the defense in a criminal case?" Collins did not respond to the question.[1] The trial judge refused defense requests to conduct additional voir dire, and Collins was selected as a juror.[2]

After discovering the background of Collins' sons, defense counsel moved for a new trial on the grounds of juror bias. Appellants' attorneys argued that Collins could not have served as an unbiased juror in a prosecution for heroin trafficking because his sons' lives had been ruined by heroin use. The trial judge denied the motion for a new trial.

■ The Sixth Amendment right to trial by jury "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). In investigating charges of juror bias or misconduct, the trial court "will necessarily be directed by the content of the allegations, including the seriousness of the alleged misconduct or bias, and the credibility of the source." *United States v. Hendrix*, 549 F.2d 1225, 1227–28 (9th Cir. 1977).[3] If the

---

* Honorable C. William Kraft, Jr., Senior United States District Judge, Eastern District of Pennsylvania, sitting by designation.

1. It is ironic that the only question juror Collins responded to during voir dire was the following: "Have any members of the panel during their current jury service or during any prior service had occasion to serve in any case involving drug or narcotic offenses?" Collins responded, "I was on a case here a couple of months ago for narcotics, but it wouldn't affect me." The judge replied, "Thank you, sir," and did not pursue the inquiry.

2. The problems with juror Collins might have been avoided had the trial judge permitted a more extensive voir dire. Among the additional voir dire questions proposed by the defense

was Question 22: "Does any member of the panel have any friends or relatives who have been involved with heroin? If so, would this fact prevent anyone from rendering a fair and impartial verdict?" The trial judge refused to ask prospective jurors this question.

The hazards of the trial court's reluctance to permit additional voir dire became apparent at trial. On the second day of the trial, the Government moved to strike juror Edward Sharrar, Jr. from the jury panel, after it was learned that he had a son awaiting trial on a federal criminal charge. Sharrar, who had not revealed this information during voir dire, was replaced by one of the alternate jurors.

3. It is within the trial court's discretion to determine whether to hold an evidentiary hearing on allegations of juror bias or misconduct.

allegations are found to be true, the court must decide whether the defendant was denied his constitutional right to an impartial jury. "The test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *United States v. Klee*, 494 F.2d 394, 396 (9th Cir. 1974). Even if "only one juror is unduly biased or prejudiced," the defendant is denied his constitutional right to an impartial jury. *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977).

■ The allegations of juror bias here were extremely serious and the facts upon which they were founded were not open to dispute. If Collins, during voir dire, had revealed that he had two sons serving prison terms for heroin-related crimes, the trial court undoubtedly would have excused him from serving on the jury. Regardless of the reason for Collins' nondisclosure, we conclude that his sons' tragic involvement with heroin bars the inference that Collins served as an impartial juror. *United States v. Allsup*, 566 F.2d 68, 71–72 (9th Cir. 1977) (bias may be presumed from the "potential for substantial emotional involvement" inherent in certain relationships).

## II

■ Appellants' motion for a new trial was *not* denied because the trial judge found Collins to have been unbiased, but rather because he presumed that Collins could not have influenced the jury's verdict. The trial judge refused to grant appellants a new trial because he doubted that Collins' presence on the jury could have affected the verdict. ("As I say, this Oklahoma Indian who is a laborer in his days when he is employed, who has a seventh-grade education, obvious difficulty with even filling out his questionnaires, I just can't believe that he was a factor in precipitating a guilty verdict in this case, after four days of trial with four defendants, and he was able to persuade the other eleven jurors to agree with him in less than two hours on a verdict

*United States v. Hendrix*, 549 F.2d 1225 (9th Cir. 1977). This discretion is not unbounded, and other Circuits have imposed stringent re-

of guilty as to all four defendants.") This reasoning is at odds with *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977), where we noted that: "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel." Regardless of what role Collins played during jury deliberations, appellants were denied their constitutional right to an impartial jury by his presence on the panel. Thus we hold that the district court erred by denying appellants' motion for a new trial.

## III

Appellants also contend that the district court erred by refusing to instruct the jury on the possibility of finding multiple conspiracies. Appellants were jointly tried under an indictment charging them, and at least three other individuals, with participation in a single conspiracy to possess and to distribute heroin. The Government contended that the evidence established a "chain conspiracy" in which Yanez and Jones acted as suppliers of heroin, Martinez served as a courier and Eubanks was a buyer.

Appellants proposed two jury instructions regarding the possibility of finding multiple conspiracies. Requested Instruction No. 20 stated: "The Indictment charges a single conspiracy. If you find that the proof showed two or more other conspiracies and the defendant was not a party to these conspiracies, a material variance between the Indictment and the proof exists and you must acquit the defendant." Requested Instruction No. 21 stated: "Further, if you find that the evidence showed, not the single alleged conspiracy in the Indictment, but a series of separate and unconnected conspiracies involving different people, a material variance exists and there cannot be a conviction of the conspiracy charged in the Indictment based upon that evidence." The trial court refused to deliver the requested charges.

quirements for its exercise. *See United States v. Doe*, 513 F.2d 709 (1st Cir. 1975).

■ The requested instructions, as phrased, were not accurate statements of law. Instruction No. 20 was defective because the existence of other conspiracies would not preclude the jury from finding that defendants were involved in the overall conspiracy charged in the indictment. *United States v. Perry*, 550 F.2d 524, 533 (9th Cir. 1977) ("the jury could find that there were several different agreements involving the defendants, all of which would then connect the defendants to the general overall conspiracy as charged in the indictment"). Instruction No. 21 was incomplete. It is axiomatic that if the evidence did not show "the single alleged conspiracy in the Indictment," then appellants could not be convicted of that particular conspiracy. But this does not imply that appellants could not be convicted of any conspiracy under the indictment because of a variance between the indictment's allegations and the evidence. In *United States v. Griffin*, 464 F.2d 1352 (9th Cir. 1972), we held that defendants charged with participation in a single conspiracy could be convicted of separate conspiracies, if the jury was cautioned not to consider evidence admitted against members of other conspiracies in considering the guilt of individual defendants.

■ The trial judge properly refused appellants' instructions, but he should not have ignored the possibility that the jury could have found multiple conspiracies. If it is possible under the evidence for the jury to find that multiple conspiracies existed, then the court should instruct the jury on the issue. *United States v. Perry*, 550 F.2d 524, 533 (9th Cir. 1977). When the possibility of a variance between the indictment and the trial proof appears, the jury should also be given a limiting instruction about the procedure for considering evidence of multiple conspiracies. *United States v. Griffin*, 464 F.2d 1352, 1357 (9th Cir. 1972); *United States v. Varelli*, 407 F.2d 735, 746 (7th Cir. 1969). The evidence here was suf-

ficient to support the jury's finding that a single conspiracy had occurred; but it was also sufficient to warrant a jury instruction on the possibility of finding multiple conspiracies.[4] Based on the evidence produced at trial, the jury could have found that multiple conspiracies had taken place, rather than the single conspiracy charged in the indictment. Thus the trial judge should have instructed the jury on the multiple conspiracy issue.

## IV

Appellants also argue that the trial judge admitted prejudicial hearsay testimony against them, despite their objections. At trial the defense raised numerous hearsay objections to the testimony of the prosecution's star witness, Gloria Baca. Baca's deceased common-law husband, Luis Gonzales, Jr., had played a key role in the alleged conspiracy to distribute heroin. The alleged conspirators had often met with Gonzales in Baca's presence and Gonzales often contacted them over the phone in the home where Baca and Gonzales lived. Baca testified about the actions of the alleged conspirators, about statements she had heard them make to one another, and about what Gonzales told her about the alleged conspiracy. While Baca was not involved in the conspiracy at its outset, she eventually accompanied Gonzales on his trips to obtain heroin and she assumed at least a passive role in the conspiracy.

■ The Government correctly notes that those portions of Baca's testimony that related what she saw or did were not hearsay. Thus Baca's testimony that she observed appellants in possession of heroin is not inadmissible hearsay. Eubanks' claim that Baca was incompetent to identify heroin is not a reason to exclude her testimony because it goes to the weight and not to the admissibility of the evidence.

4. The jury could have found that separate conspiracies had occurred involving different appellants. For example, the jury could have found that Jones was "an independent peddler of narcotics . . . selected as the most

immediately available source of supply," rather than a member of the overall conspiracy. *United States v. Reina*, 242 F.2d 302, 306 (2d Cir. 1957).

Baca's testimony about statements made by the alleged conspirators is more susceptible to hearsay objections. The Government argues that the statements related by Baca were either party admissions or declarations of co-conspirators which are excluded from the definition of hearsay by the Federal Rules of Evidence. Rule 801(d) of the Federal Rules of Evidence provides in pertinent part: "A statement is not hearsay if . . (2) *Admissions by party-opponent.* The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity or . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Under the provisions of Rule 801(d), inculpatory statements by appellants, which Baca related, are admissible as party admissions only against the individual declarants. Admissions by individual defendants could not be considered as evidence against the other defendants. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Thus Baca's testimony about statements made by appellants and others was admissible against all defendants only if it falls within the co-conspirator exception embodied in Rule 801(d)(2)(E).

▮ To qualify for the hearsay exception of Rule 801(d)(2)(E), "a foundation [must be] laid to show that: (1) the declaration was in furtherance of the conspiracy, (2) it was made during the pendency of the conspiracy, and (3) there is independent proof of the existence of the conspiracy and of the connection of the declarant and the defendant to it. *United States v. Snow,* 521 F.2d 730, 733 (9th Cir. 1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101

(1976)." *United States v. Weiner,* 578 F.2d 757, 768 (9th Cir. 1978). It is the responsibility of the judge, rather than the jury, to determine whether a sufficient foundation has been established for declarations to be admissible under the co-conspirator exception. *United States v. King,* 552 F.2d 833 (9th Cir. 1976); *Carbo v. United States,* 314 F.2d 718 (9th Cir. 1963).

▮ At the outset of Gloria Baca's testimony, the trial judge explained to the jury the law of conspiracy and the co-conspirator exception to the hearsay rule.[5] This instruction was entirely proper, but it did not relieve the trial judge of responsibility for making the initial determination about the admissibility of Baca's testimony. *United States v. King,* 552 F.2d 833 (9th Cir. 1976). In admitting, over appellants' objections, Baca's testimony about the statements of alleged conspirators, it was incumbent upon the trial judge to determine that a sufficient foundation existed to invoke the hearsay exception of Rule 801(d)(2)(E).[6] Sufficient evidence had to exist to support an inference that the statements ·were made in furtherance of the conspiracy, while the conspiracy was in existence, and independent proof had to establish the existence of a conspiracy in which the declarant and defendants participated. A review of the trial transcript convinces us that, while some of the conversations related by Baca fell within the ambit of the co-conspirator exception, other statements were inadmissible hearsay because they were not made in furtherance of the alleged conspiracy.

▮ Hearsay declarations of co-conspirators cannot be received into evidence

---

**5.** The trial judge told the jury: "If and when it appears from the evidence in a case that such a common plan or arrangement did exist and that a defendant was one of the parties to or a member of the plan or arrangement, then the acts thereafter knowingly done and the statements thereafter knowingly made by any person likewise found to be a member may be considered by the jury as evidence in the case as to the defendant found to be a member, even though the acʈs or statements may have occurred in the absence of and without the knowledge of the defendant, provided those acts and statements were knowingly done and made during the continuance of a common plan or arrangement and in furtherance of some intended object or purpose of the plan or arrangement."

**6.** Of course, the trial judge could have conditionally admitted the challenged statements, subject to a motion to strike if the prosecution failed to establish the existence of the foundational facts.

under the co-conspirator exception of Rule 801(d)(2)(E) unless the declarations were made in furtherance of the conspiracy. *United States v. Weiner*, 578 F.2d 757, 768 (9th Cir. 1978). Not all statements made by co-conspirators can be considered to have been made in furtherance of the conspiracy. *Fiswick v. United States*, 329 U.S. 211, 217, 67 S.Ct. 224, 227, 91 L.Ed. 196 (1946) ("confession or admission by one co-conspirator after he has been apprehended is not in any sense a furtherance of the criminal enterprise"). "Mere conversation between conspirators" or "merely narrative declarations" are not admissible as declarations in furtherance of the conspiracy. *United States v. James*, 510 F.2d 546, 549 (5th Cir. 1975); *United States v. Birnbaum*, 337 F.2d 490, 495 (2d Cir. 1964); *United States v. Goodman*, 129 F.2d 1009, 1013 (2d Cir. 1942). For declarations to be admissible under the co-conspirator exception, they must further the common objectives of the conspiracy.

█ Baca's testimony about some of the conversations between alleged conspirators that occurred wholly within her presence did relate declarations in furtherance of the conspiracy. Baca testified that she was present when Yanez told Gonzales to stop using heroin so that he could distribute the drug for Yanez. Later, Baca overheard Yanez and Gonzales discuss whether Gonzales had "cleaned up" enough to begin distribution of the drug. Baca also testified that Eubanks and Gonzales met at the house she shared with Gonzales. Eubanks told Gonzales that he wanted to purchase a large amount of heroin. After making a phone call, Gonzales told Eubanks that Yanez was interested in making the transaction, but that he wanted to see the money first. These declarations all furthered the objectives of the alleged conspiracy because they set in motion transactions that were an integral part of the heroin distribution scheme.

█ In contrast, most of the statements made by Gonzales to Baca that incriminated appellants cannot reasonably be considered to have been in furtherance of the conspiracy. Gonzales and Baca had been living together in a common-law marriage relationship. Gonzales often discussed his activities with Baca, who did not participate in the alleged conspiracy until long after its inception. Baca testified that Gonzales told her that he was going to Tucson to obtain narcotics from Yanez. There is no evidence that Gonzales' statement was a declaration in furtherance of the conspiracy. Gonzales was not seeking to induce Baca to join the conspiracy and his statement did not assist the conspirators in achieving their objectives. Gonzales' "statement was, at best, nothing more than [a] casual admission of culpability to someone he had individually decided to trust." *United States v. Moore*, 522 F.2d 1068, 1077 (9th Cir. 1975).

Similarly, when Gonzales informed Baca about the persons to whom he had spoken over the telephone, he was not making a declaration in furtherance of the conspiracy. Instead, he was merely informing his common-law wife about his activities. When Baca phoned Yanez' home in Tucson to speak with Gonzales, she was told by Yanez' wife, Eloise, that Gonzales was with Yanez. This statement also was not made in furtherance of the conspiracy, and thus it should not have been admitted under the co-conspirator exception to the hearsay rules.

█ After Baca began travelling to Tucson with Gonzales and assisted him with the arrangements for obtaining heroin, she assumed a role in the alleged conspiracy. Yet Baca's participation in the conspiracy did not convert Gonzales' statements to her into declarations in furtherance of the conspiracy. Most of Gonzales' statements to Baca that were included in her testimony did nothing to advance the aims of the alleged conspiracy. At one point, Gonzales told Baca that Yanez had arranged their trip to Tucson. On another occasion, Gonzales told Baca that they were going to Phoenix together to pick up some heroin from Leroy. At another time, Baca was informed by Gonzales that Fred and Mel had been unable to pick up any heroin. While eating at a Denny's in Arizona, Baca heard Yanez say that he was going to meet

with Leroy. There is no indication in the record that these statements were any more than conversations between conspirators that did nothing to advance the aims of the alleged conspiracy. The incriminating references to absent persons were not designed to induce Baca's continued participation in the conspiracy or to allay her fears, unlike the statements at issue in *United States v. Eaglin,* 571 F.2d 1069 (9th Cir. 1977) and *Salazar v. United States,* 405 F.2d 74 (9th Cir. 1968). *Cf. United States v. Crockett,* 514 F.2d 64 (5th Cir. 1975); *United States v. Knippenberg,* 502 F.2d 1056 (7th Cir. 1974).[7]

■ Because there was nothing in the record to support the inference that the various statements made by Gonzales to Baca were made in furtherance of the conspiracy, the trial court should not have admitted them over objection under the co-conspirator exception to the hearsay rules. On retrial, the prosecution is not precluded from introducing additional evidence that would permit the inference that Gonzales' statements were made in furtherance of the conspiracy.[8]

Because we reverse appellants' convictions, it is unnecessary for us to reach appellants' other claims of errors that are unlikely to recur upon retrial.

REVERSED.

ELY, Circuit Judge (concurring):

I concur in the superb majority opinion for which my Sister Hufstedler is principally responsible.

As, however, I near the fifteenth anniversary of my service with our court, I must voice concerns that have troubled me for many years, even for a much longer time than I have performed the judicial function. My concerns have to do with the unrestrained, and sometimes indiscriminate, application by prosecuting authorities of the conspiracy charge. As I see them, the circumstances of this case present a unique opportunity and, perhaps, the last opportunity, that I shall have to record my pertinent sentiments. There is nothing new about my views, for they have been repeatedly expressed, better than I can express them, by some of the greatest, most perceptive jurists that have ever served our country's judicial system. I shall reiterate, particularly, utterances of Mr. Justice Jackson and Judge Learned Hand, both of whom have long since gone to their eternal peace.

Here involved is a prosecution of seven individuals charged by the prosecution with having participated in a vastly far-reaching, wide-ranging illegal scheme involving the distribution of heroin. As I see it, the prosecuting authorities unwisely adopted what may have appeared to be a simple expedient, i. e., the charge of a conspiracy that was too broad, sweeping together into a single prosecution all of the loose ends that involved law enforcement investigators encountered during their investigation of the illicit activity. The ablest trial judge that ever lived would have had difficulty in separating incriminating testimony that

---

**7.** For example, in *United States v. Crockett,* 514 F.2d 64, 71 (5th Cir. 1975) "the testimony of Penny Fennell that Crockett, during the course of the conspiracy, referred to Sheriff Futch as 'his man' and told her, 'that he [Futch] would take care of him,' was admissible because Crockett was then acting in the interest of the conspiracy by allaying Ms. Fennell's fears of being caught participating in gambling activities." In *United States v. Knippenberg,* 502 F.2d 1056, 1061 (7th Cir. 1974) the co-conspirator exception was held applicable because "[t]he record very reasonably bears the interpretation that Walsh told Mrs. Post the checks were from Knippenberg so as to reassure her and help induce her to deposit them." Here, there is no indication that Gonzales' statements

about appellants were made to induce any action or to allay any fears of Baca.

**8.** In holding Gonzales' statements inadmissible under Rule 801(d)(2)(E), we are mindful of the fact that a contrary holding would raise serious questions about whether appellants were denied their Sixth Amendment confrontation rights by the introduction of the Gonzales' statements. This court has recognized that "[a]dmissibility under the co-conspirator exception to the hearsay rule does not . . . automatically demonstrate compliance with the confrontation clause." *United States v. Eaglin,* 571 F.2d 1069, 1083 (9th Cir. 1977); *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

was admissible as to some of the accuseds and prejudicially inadmissible as to others. If that is true, it is inconceivable to me that any jury composed of lay persons, however conscientious and intellectual in fields outside the law, and regardless of whatever cautionary instructions may have been given, could have completely disregarded inflammatory evidence, especially hearsay evidence, that, as the case developed, was legally inadmissible as against some of the accuseds.

There is no need for me to review the prosecution's testimony in precise detail. Suffice it to say that the evidence would have allowed the jury to find that the defendants had committed any of at least five different offenses. Those alternative offenses could have been: (1) a separate conspiracy between Yanez and Annie Osuna; (2) a separate conspiracy among Yanez, Eubanks and Gonzales, the latter a known, but unindicted conspirator; (3) an isolated sale by Yanez to Eubanks; (4) a separate conspiracy between Yanez and Jones; (5) a single, isolated transfer of three ounces of heroin from Jones to Yanez.

Thus, the numerous possibilities for variance between the indictment, charging the appellants with having engaged in a single, all-encompassing conspiracy, and the proof, which would, as here, support jury findings of multiple, smaller conspiracies, or even isolated transactions between certain codefendants, reinforces my concern that the prosecution may have abused its joinder powers under Fed.R.Crim.P. 8 by bringing to trial at one time every individual who may have had even the slightest connection with a participant in the distribution scheme that was alleged.

I am well aware that the joinder of numerous defendants in a single joint trial may result in judicial economy (see United States v. Kennedy, 564 F.2d 1329, 1334 (9th Cir. 1977), cert. denied, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978)), but we, as judges, should not shirk our duty to protect our courts from becoming mere prosecutorial mills through which criminal convictions are processed all in the name of judicial efficiency. This danger of sacrificing individual justice arises most often in a case such as this, wherein questions are raised as to whether there was one single conspiracy or several minor conspiracies. See United States v. Sperling, 506 F.2d 1323, 1340–1341 (2nd Cir. 1974), cert. denied, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975).[1] Our district judges have the first and most critical responsibility, for they are positioned to sever trials when they can readily see, quicker than we, injustices that may occur if such is not done.

Courts have protested unavailingly the habit of the government to indict multiple defendants for conspiracy in addition to, and even in lieu of, the substantive offense itself (see Krulewitch v. United States, 336 U.S. 440, 445–446, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring)) and have suggested that this "loose practice . . . constitutes a serious threat to fairness in our administration of justice." Id. at 446,

---

1. In Sperling, the court warned:

In view of the frequency with which the single conspiracy vs. multiple conspiracies claim is being raised on appeals before this court . . ., we take this occasion to caution the government with respect to future prosecutions that it may be unnecessarily exposing itself to reversal by continuing the indictment format reflected in this case. While it is obviously impractical and inefficient for the government to try conspiracy cases one defendant at a time, it has become all too common for the government to bring indictments against a dozen or more defendants and endeavor to force as many of them as possible to trial in the same proceeding on the claim of a single conspiracy when the criminal acts could be more reasonably regarded as two or more conspiracies, perhaps with a link at the top. Little time was saved by the government's having prosecuted the offenses here involved in one rather than two conspiracy trials. On the contrary, many serious problems were created at the trial level, including the inevitable debate about the single conspiracy charge, which can prove seriously detrimental to the government itself. We have already alluded to our problems at the appellate level, where we have had to comb through a voluminous record to give adequate consideration to the claims of eleven separate appellants.

United States v. Sperling, 506 F.2d at 1340–1341.

69 S.Ct. at 719–20. The greatest threat, of course, is that which I see here: the probability of prejudice which arises from the inevitable insinuation of guilt by association when evidence is admissible against some of the defendants but not against all of them. Regretfully, it appears that our prosecutors have begun to bank on this prejudice. It is therefore understandable that Judge Learned Hand long ago described the conspiracy charge as "the darling of the modern prosecutor's nursery." *Harrison v. United States,* 7 F.2d 259, 263 (2nd Cir. 1925).

With increasing frequency our court is confronted by multiple defendant prosecutions raising the *Kotteakos* multiple conspiracies-single prosecution issue. *See United States v. Bracy,* 566 F.2d 649, 657–658 (9th Cir. 1977), *cert. denied,* 435 U.S. 965, 98 S.Ct. 1603, 56 L.Ed.2d 57 (1978); *United States v. Kearney,* 560 F.2d 1358, 1362–1363, *cert. denied,* 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977); *United States v. Perry,* 550 F.2d 524, 532–533 (9th Cir. 1977), *cert. denied,* 434 U.S. 827, 98 S.Ct. 104, 54 L.Ed.2d 85 (1977). In each case, as was required here, an immense amount of our judicial time has been spent sifting through testimony in an effort fairly to determine if there was in fact sufficient evidence to tie each of the conspiracy defendants to a common unlawful agreement.

Furthermore, considering the great potential for prejudice to the various individual defendants arising from one mass trial, I again remind all, including myself, that a conviction must rest upon individual guilt beyond a reasonable doubt, not mass guilt. *Kotteakos v. United States, supra,* 328 U.S. 750, at 774, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).[2] The prejudice to the individual defendant forced to defend himself at a joint trial with numerous other alleged co-conspirators is compounded in instances where, as here, the proof as readily indicates the existence of a number of isolated transactions or several small conspiracies as it does the single conspiracy charged by the prosecution. Just as the danger of inferring guilt from one codefendant to another increases in proportion to the number of persons compelled to stand trial together, (*Blumenthal v. United States,* 332 U.S. 539, 559, 68 S.Ct. 248, 92 L.Ed. 154 (1947)), the danger of guilt by association at a multiple defendant trial intensifies as the number of possible conspiracies grows. Undoubtedly there is a tendency for the jury to believe that a defendant must have been involved in the alleged all-encompassing conspiracy, once it finds that individual to have committed one of the minor acts which the prosecution contends is but an extension of the greater conspiracy. This, of course, is the very heart of the single charge-multiple conspiracies issue: whether the minor act itself was in fact an act in furtherance of, and with knowledge of, the single conspiracy. I have already mentioned my doubts about the ability of even the most conscientious jury to keep separate the evidence that may be properly considered against

---

2. *Kotteakos* held:

Guilt with us remains individual and personal, even as respects conspiracies. It is not a matter of mass application. There are times when of necessity, because of the nature and scope of the particular federation, large numbers of persons taking part must be tried together or perhaps not at all, at any rate as respects some. When many conspire, they invite mass trial by their conduct. Even so, the proceedings are exceptional to our tradition and call for use of every safeguard to individualize each defendant in his relation to the mass. Wholly different is it with those who join together with only a few, though many others may be doing the same and though some of them may line up with more than one group.

Criminal they may be, but it is not the criminality of mass conspiracy. Nor does our system tolerate it. That way lies the drift toward totalitarian institutions. True, this may be inconvenient for prosecution. But our Government is not one of mere convenience or efficiency. It too has a stake, with every citizen, in his being afforded our historic individual protections, including those surrounding criminal trials. About them we dare not become careless or complacent when that fashion has become rampant over the earth.

Here toleration went too far.

*United States v. Kotteakos, supra,* 328 U.S. at 772–773, 66 S.Ct. at 1252.

524

each defendant. In a case such as this, I conclude that the danger of prejudice arising from a joint trial far outweighs any inconvenience that would be imposed upon the government and the courts were the prosecution compelled to conduct several separate trials.

It is the trial court's duty under our Fed.R.Crim.P. 14 to balance the expense and inconvenience to the government of separate trials against the prejudice to the individual codefendants (*United States v. Campanale*, 518 F.2d 352, 359 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976)), and although the decision whether to grant a severance or to order separate trials is left to the sound discretion of the trial court (*United States v. Kennedy*, 564 F.2d 1329, 1334 (9th Cir. 1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978)), that discretion is not without limits. *United States v. Hernandez-Berceda*, 572 F.2d 680, 682 (9th Cir. 1978), *cert. denied*, 436 U.S. 949, 98 S.Ct. 2856, 56 L.Ed.2d 792 (1978). I respectfully submit that this case approaches, if it does not exceed, those limits.

I conclude by quoting Mr. Justice Jackson, a great lawyer and a great Justice:

When the trial starts, the accused feels the full impact of the conspiracy strategy. Strictly, the prosecution should first establish *prima facie* the conspiracy and identify the conspirators, after which evidence of acts and declarations of each in the course of its execution are admissible against all. But the order of proof of so sprawling a charge is difficult for a judge to control. As a practical matter, the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of existence of the conspiracy itself. In other words, a conspiracy often is proved by evidence that is admissible only upon assumption that conspiracy existed. The naive assumption that prejudicial effects can be overcome by instructions to the jury, *cf. Blumenthal v. United States*, 332 U.S. 539, 559, 68 S.Ct. 248, 92 L.Ed. 154, all practicing lawyers know to be unmitigated fiction. *See Skidmore v. Baltimore & Ohio R. Co.*, 167 F.2d 54 (2d Cir.).

*Krulewitch v. United States*, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (Jackson, J., concurring).