UNITED STATES of America, Plaintiff,

v.

Laurence John LAYTON, Defendant.

No. CR–80–416 RFP.

United States District Court,
N.D. California.

Jan. 11, 1982.

James F. Hewitt, Federal Public Defender, and Frank O. Bell, Jr., Chief Asst. Federal Public Defender and Tony Tamburello, San Francisco, Cal., for defendant.

Robert L. Dondero and Michael D. Nerney, Asst. U.S. Attys., San Francisco, Cal., for plaintiff.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

Laurence Layton has been indicted on four criminal counts arising from the events which occurred at the Port Kaituma airport in the nation of Guyana on November 18, 1978. Those events resulted in the death of Congressman Leo J. Ryan, then a member of the United States House of Representatives from the 11th Congressional District of California, and the wounding of Richard Dwyer, the Deputy Chief of Mission for the United States in the Republic of Guyana. Congressman Ryan had traveled to Guyana for the purpose of investigating certain allegations that had arisen concerning the Peoples Temple settlement in Jonestown. Mr. Layton had lived in Jonestown for the few months preceding the events in question here. The indictment charges Mr. Layton with (1) conspiracy to murder a Congressman, under 18 U.S.C. § 351(d); (2) aiding and abetting in the murder of a Congressman, under 18 U.S.C. §§ 351(a), 2; (3) conspiracy to murder an internationally protected person, under 18 U.S.C. § 1117; and (4) aiding and abetting in the attempt-

ed murder of an internationally protected person, under 18 U.S.C. §§ 1116(a), 2.

The jury trial on the foregoing charges commenced in this court on August 18, 1981. On September 26, 1981, after it had become clear that the jury would be unable to reach a verdict on any of the four counts, we declared a mistrial. The government has now indicated its intent to go forward with a retrial of the defendant.

The government has moved under Rule 12(d) of the Federal Rules of Criminal Procedure for an order allowing it to present at retrial certain statements that were ruled inadmissible during the first Layton trial. No new arguments have been advanced in support of the present motion. The government has instead called the court's attention to a number of materials already filed, and to relevant portions of the Layton transcript.

The items sought to be introduced are:

1. Statements of Jim Jones to the membership of the Peoples Temple prior to the arrival of Congressman Leo Ryan and his party.

2. Statement of Jim Jones to his attorney, Charles Garry, concerning the departure of Layton as a feigned defector and the dangers for the Ryan mission.

3. Statement of Jim Jones to the members of the Peoples Temple shortly before and during the mass suicide at Jonestown, commonly known as the "Last Hour Tape."

4. Statement of Peoples Temple member Tim Carter to Peoples Temple member Gerald Parks regarding Carter's infiltration of the Concerned Relatives in the San Francisco Bay Area.[1]

The United States also seeks reconsideration of the court's refusal to allow the government to cross examine any defense experts concerning tapes of interviews between Layton and Dr. Hardat Sukhdeo, a psychiatrist who was retained in early 1979 by Layton's defense counsel primarily to treat Layton, and secondarily to advise him and Layton's Guyanese attorneys in relation to charges that might be filed against Layton in Guyana or elsewhere. Though the defense presented no experts in the first trial of Layton in this court, the issue may become significant upon retrial.

A. *Decision Whether to Rule on the Government's Motion at the Present Time, or to Defer Such Ruling*

Until recently, it was thought to be entirely within the discretion of the trial judge whether to defer or rule upon permissive pretrial motions to exclude evidence. However, in *United States v. Barletta,* 644 F.2d 50 (1st Cir.1981), the First Circuit has considered that question and has concluded that, under certain circumstances, the trial judge *must* rule upon such motions prior to trial. This is true where such a ruling will require no review or *de minimis* review of the evidence. Such was held to be the case in *Barletta.*

The circumstances there were very close to the circumstances which face us on the present motion. There, as here, the defendant had been tried once before. During the trial, the court had excluded a tape recording offered by the government. As in the *Layton* case, the proceedings ended in a mistrial. The government then indicated its intent to seek a retrial, and simultaneously moved for a pretrial ruling on the admissibility of the contested tape. The court refused to rule on the government's motion, and the government appealed from this refusal. The appellate court reversed the trial judge.

■ Since the circumstances which face us in the instant case are so similar to the facts underlying the *Barletta* opinion, we are persuaded in this context by the reasoning articulated in that decision. However, we wish to make it clear that we would not (and, in fact, *did* not) attempt to decide evidentiary issues as complex as the ones posed by the government, prior to an initial

---

1. The Concerned Relatives was a group of family members of Jonestown residents. Some of the Concerned Relatives ultimately accompa- nied Congressman Ryan on his investigative mission to Jonestown.

trial. It is only in the present context, where we have already heard the evidence and the arguments of counsel in the initial *Layton* trial, that we feel confident it will not be prejudicial to either party for us to follow the *Barletta* decision and rule in advance of trial.

We do not by our present ruling intend to encourage the government routinely to file and appeal pretrial evidentiary motions in criminal cases. The federal judiciary prides itself on its present ability to process criminal matters with dispatch. Other jurisdictions, which allow numerous occasions for interlocutory appeals, have been less fortunate in their efforts to assure criminal defendants of their right to a speedy trial. To adopt a practice of readily acceding to the government's desires for pretrial evidentiary rulings would be to cause great mischief and delay within our own system. Accordingly, we wish to state with clarity that our decision to rule on the government's present motion is limited to the context in which the motion has arisen.

B. *Rulings on the Government's Motion*

1. *Statements of Jim Jones to Peoples Temple members prior to the arrival of the Ryan party.* The tape sought to be introduced includes such statements by Jones as "If he [Congressman Ryan] stays long enough for tea, he's gonna regret it ... I want to shoot someone in the ass like him so bad ... I'm not passing this opportunity up. Now if they come in ... they come in on their own risk ... If they enter the property illegally, they will not leave it alive."

The government has sought to introduce this evidence on three theories: as a co-conspirator's statement, as falling within the state of mind exception to the hearsay rule, and as nonassertive conduct.

■ a. *Co-conspirator's statement.* The government offers the statements as evidence that there was a conspiracy to kill Congressman Ryan and his party. In order for the statements to be admissible as the statements of a co-conspirator, the government must make three showings: (1) that

the declarations were in furtherance of a conspiracy; (2) that they were made during the course of that conspiracy; (3) that there is independent proof of the existence of the conspiracy and of the connection of the declarant and the defendant to it. Rule 801(d)(2)(E) of the Federal Rules of Evidence; *United States v. Snow,* 521 F.2d 730 (9th Cir.1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976). In addition, it must be demonstrated that the admission of the co-conspirator's statement would not violate the defendant's rights under the Confrontation Clause. *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

■ The statements do not meet the first of the tests. The Ninth Circuit has noted that "mere conversations between co-conspirators" or "merely narrative declarations" are not admissible as statements in furtherance of a conspiracy. *United States v. Eubanks,* 591 F.2d 513, 520 (9th Cir.1979). The statements must "further the common objectives of the conspiracy" in order to qualify under Rule 801(d)(2)(E). *Id.* Statements which "set in motion transactions that ... [are] an integral part of the [conspiracy]" are admissible, as are statements designed to induce the listener to join a conspiracy. But mere "casual admission[s] of culpability to someone ... [the declarant has] individually decided to trust" do not meet the test. *Id. See also United States v. Fielding,* 645 F.2d 719 (9th Cir.1981); *United States v. Castillo,* 615 F.2d 878, 882–83 (9th Cir.1980); *United States v. Eaglin,* 571 F.2d 1069 (9th Cir.1977), *cert. denied,* 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1978). Under this standard, Jones' statements did not further a conspiracy, if any, to kill Congressman Ryan and the members of his party.

b. *State of mind.* Here, the theory is that Jones was indicating his then existing desire to kill members of the Ryan party, and that this indication should be taken at face value and admitted for the truth of the matter stated.

There are three requirements to the admissibility of statements under Rule 803(3) of the Federal Rules of Evidence, the state of mind exception to the hearsay rule. *See United States v. Ponticelli,* 622 F.2d 985 (9th Cir.1980), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980).

First, the statements must be contemporaneous with the later event sought to be proven—that is, Jones' statements must be shown to have been not too far distant in time from the shootings. That is true here. The statements appear to have been made within a day of the arrival of Congressman Ryan's party in Jonestown.

Second, it must be shown that the declarant had no chance to reflect—that is, no time to fabricate or to misrepresent his thoughts. It is less clear that this test can be met. At this early stage, it is not obvious that Jones did intend to kill Ryan. He said he did, but this may have just been done with the intent to stir up hostility against Leo Ryan. He may not have formed an intent to harm Ryan until later, despite his words. However, the distinction is not too significant here. Whether he intended to kill Ryan at that time or not, he made statements to the effect that that was his intent; and these statements were heard by his followers and were probably taken at face value by them. Considering the relevancy theory on which the statements are being offered, this showing of nonmisrepresentativeness is adequate.

Third, the statements must be shown to be relevant to an issue in the case. Here, they are relevant to the question of conspiracy. The chain of logic is as follows: Jones indicated his desire to shoot Congressman Ryan, and to kill members of the Ryan party. Under the reasoning of *Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), the fact that Jones made these statements makes it somewhat more likely that, when the killings finally did occur, he had something to do with them. Since he was in a position of authority and was even an object of adulation at Jonestown, the fact that it is more likely he had something to do with the killings makes it somewhat more likely that a large number of his devoted followers were involved, too. Since it is more likely that a large number of his followers were involved, it makes it somewhat more likely that Layton was involved as well.

This is a very subtle chain of logic. Instead of thinking through each link in the chain, the jury is likely to assume that, in making the statements, Jones was acting as a mouthpiece for all of his followers, including Layton. The improper leap in the logic is quite dramatic: Jones said he wanted to shoot Ryan; therefore, Layton wanted Ryan to be shot, too.

The House Committee on the Judiciary has acknowledged that the state of mind exception to the hearsay rule is susceptible to such lapses in logic. Accordingly, it has recommended that a hearsay declaration of one person's state of mind be "admissible only to prove his future conduct, not the future conduct of another person." House Report No. 93–650, Note to Rule 803(3) of the Federal Rules of Evidence, 28 U.S.C.A. at 579. While, strictly speaking, Jones' statements are not sought to be used to prove Layton's conduct, the danger that the jury will make a highly prejudicial leap is certainly present.

The most widely quoted language on this subject is Justice Cardoza's eloquent dictum in *Shepard v. United States,* 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933). There, Shepard was accused of murdering his wife with poison. The defense maintained that Mrs. Shepard's death was a suicide. The government sought to admit the following statement by the wife: "Dr. Shepard has poisoned me." On appeal, the government argued that this statement was admissible not to show that Dr. Shepard did, in fact, poison his wife, but merely to show that Mrs. Shepard *thought* he did. Since Mrs. Shepard thought she had been poisoned, the government said, she probably was not thinking in suicidal terms at the time of her death. The Court held the statement inadmissible on that theory, since the jury had not been instructed on the theory at trial. The Court then strongly suggested that not

even a limiting instruction would have rendered the statement admissible as evidence of Mrs. Shepard's state of mind:

It will not do to say that the jury might accept the declarations for any light that they may cast upon the existence of a vital urge, and reject them to the extent that they charged the death of some one else. Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed. They have their source very often in considerations of administrative convenience, of practical expediency, and not in rules of logic. When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out.

*Id.* at 104, 54 S.Ct. at 25.

This reasoning was adopted in *United States v. Kaplan,* 510 F.2d 606 (2d Cir.1974). There, at trial, narcotics agent Alleva was permitted to testify that one Lange had told him that defendant Kaplan was Lange's "connection." This evidence was admitted only to show Alleva's state of mind—that Alleva truthfully believed Kaplan was Lange's drug connection. The trial judge carefully admonished the jury to that effect. Nonetheless, the appellate court reversed, finding that it was impossible for the jury to limit the evidence to this proper purpose. The jury would certainly conclude not only that Alleva believed Kaplan was Lange's connection, but also that Kaplan *was in fact* Lange's connection—an impermissible use of the evidence. The court then stated:

It is sound doctrine, to be sure, that juries must be supposed usually to be able and determined to follow instructions. *Bruton v. United States,* 391 U.S. 123, 135 [88 S.Ct. 1620, 1627, 20 L.Ed.2d 476] ... (1968); *Lutwak v. United States,* 344 U.S. 604, 619 [73 S.Ct. 481, 490, 97 L.Ed. 593] ... (1953); *United States v. Bell,* 500 F.2d 1287 (2d Cir., 1974). But there are limits upon the powers of jurors—or judges or anyone—to keep interconnected

thoughts separated from each other. *Bruton v. United States, supra,* 391 U.S. at 129–134 [88 S.Ct. at 1624] ....; *Jackson v. Denno,* 378 U.S. 368, 388 [84 S.Ct. 1774, 1786, 12 L.Ed.2d 908] ... (1964); *United States v. Bozza,* 365 F.2d 206, 215 (2d Cir.1966). The effort in this case must be deemed to have exceeded those limits because the "authorized" use of the evidence shaded so closely and uncontrollably into the forbidden. See *Shepard v. United States,* 290 U.S. 96, 104 [54 S.Ct. 22, 25, 78 L.Ed. 196] ... (1933).

*Id.* at 611.

The Shepard decision was also the basis for Justice Traynor's dissent in *People v. Alcalde,* 24 Cal.2d 177, 148 P.2d 627 (1944). There, Frank Alcalde was charged with the murder of his friend, Bernice Curtis. The government sought to admit the victim's statement, prior to the killing, that she was going out with Frank. The California Supreme Court held the statement admissible for the limited purpose of showing that Bernice intended to be with Frank on that evening in question. In his vigorous dissent from the majority opinion, Justice Traynor argued that, while Bernice's statement was good evidence only that she intended to go out with Frank, the jury would inevitably and impermissibly accept the evidence as proof that Frank intended to go out with her. Justice Traynor thus objected to the admission of the statement, saying, "A declaration as to what one person intended to do ... cannot safely be accepted as evidence of what another probably did." *Id.* at 189, 148 P.2d 627.

The Ninth Circuit, too, has recognized the dangers of admitting statements under the state of mind exception to the hearsay rule. In *United States v. Pheaster,* 544 F.2d 353 (9th Cir.1976), *cert. denied sub nom. Inciso v. United States,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977), the trial judge had admitted hearsay testimony by two friends of a kidnapping victim, Larry, concerning statements made by Larry, on the day of his disappearance, to the effect that he planned to meet with one of the alleged

kidnappers. The Ninth Circuit carefully reviewed the law in the area, *id.* at 374–380. Ultimately, the court concluded that it could not hold that the trial judge had erred in admitting the statements. However, the court did acknowledge "the force of the objection to the application of the *Hillmon* doctrine in the instant case." *Id.* at 380. *See also id.* at n. 18.

We recognize that in all of the cases which discuss the dangers of admitting statements indicating the declarant's state of mind and used to prove the declarant's future conduct, the defendant was actually mentioned by the declarant, so that there was a great likelihood that the jury would misuse the evidence as proof of the defendant's conduct. In the present case, that factor is absent. Jones did not mention Layton by name in the course of the statements in question. However, after a careful review of the statements themselves and of the context in which they are offered as evidence, we conclude that the prudent course is to exclude Jones' statements under the reasoning articulated in the *Shepard* case. Given Jones' stature in the community of Jonestown, the risk that the jury will assume that, in expressing his desire to shoot Congressman Ryan, he was speaking for all his followers is particularly acute. The danger of confusion which would arise from the introduction of the statements is so great as to upset the balance and warrant their exclusion. Accordingly, we hold that the statements made by Jones prior to the arrival of the Ryan party cannot be admitted for the truth of the matter stated, not even for the limited purpose of showing Jones' state of mind.

c. *Nonassertive conduct.* Similarly, the government seeks to show that Jones' statements were nonassertive conduct and were therefore nonhearsay, in accordance with Rule 801(a) of the Federal Rules of Evidence. On this theory, they do not seek to introduce the statements for the truth of the matter stated, but only seek their admission as evidence of Jones' state of mind. The government contends that even if Jones did not really mean he wanted to kill

members of the Ryan party—even if he had not formed such an intent at that time—his statements still show an overall hostility toward Congressman Ryan and his group. This is relevant because Jones was the leader of the Peoples Temple members at Jonestown; because his attitude may have permeated the cult; because it indicates he was trying to stir up resentment against the Ryan party; and because all this makes it somewhat more likely that a conspiracy eventually resulted.

However, this theory again raises the problem identified in the *Shepard* case. It is extremely unlikely that the jury will be able to hear Jones' statements that he wanted to kill Ryan, and not accept them for the truth of the matter stated. Jones' statements are as dramatic as Mrs. Shepard's comment "Dr. Shepard has poisoned me," and are as difficult for a jury to hear without using them for the wrong purpose. As Justice Cardozo noted, "Discrimination so subtle is a feat beyond the compass of ordinary minds." *Shepard, supra,* 290 U.S. at 104, 54 S.Ct. at 25.

Once the jury has improperly considered the statements for the truth of the matter asserted, we are once again confronted by the danger identified in the previous section. In the hands of the jury, the nonassertive conduct becomes an indicator of Jones' actual intent; and with that transformation comes the likelihood that the jury will make a second leap, taking the statements as direct indicators of the defendant's state of mind. Thus, we find that the statements in question are inadmissible as nonassertive conduct.

2. *Statement of Jim Jones to Charles Garry.* The government seeks the admission of Charles Garry's testimony that shortly after the Ryan party left for the airstrip on its way out of Jonestown, Jim Jones told him the following: that Larry Layton and Gerald Parks had taken all the weapons from Jonestown and were proceeding to the airstrip to engage in violent acts; that all was lost at that time; that Layton was not a defector, but was going to the airstrip to carry out a mission of violence.

The government offers this statement on one theory only: that it is a declaration against Jones' penal interest, and so is admissible for the truth of the matter stated under Rule 804(b)(3) of the Federal Rules of Evidence.

In order for the statement to qualify under this statutory exception to the hearsay rule, the government must make two showings. First, that Jones is unavailable. As Jones died in 1978, this prong of the test is easily met under Rule 804(a)(4) of the Federal Rules of Evidence.

■ The second showing the government must make is that the statement was, in fact, against Jones' penal interest. A statement against penal interest which is regarded as sufficiently trustworthy to qualify under this exception to the hearsay rule is one which "so far tend[s] ... to subject ... [the declarant] to ... criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true." Rule 804(b)(3) of the Federal Rules of Evidence. We have concluded that, for two reasons, Jones' statement does not meet the statutory standard of trustworthiness.

First, Jones made the statement to his attorney. It thus appears to have fallen within the attorney-client privilege at the time it was made. While the issue here is not whether the statement was, or is, privileged, the fact that the statement did occur in a privileged context has some bearing upon the question whether a reasonable person in Jones' position would have made the statement unless he believed it to be true. When speaking with their attorneys, clients are presumably somewhat more outspoken than they are when engaged in nonprivileged communications. Thus, a reasonable person might well make potentially incriminating statements to his or her at-

torney without being entirely certain that the statements were true. Such an exchange might occur during a discussion of the client's potential liability arising from a set of circumstances. In speaking to the attorney, the client might wish to paint the darkest possible picture of potential liability, in order to be advised as to the worst consequences that might follow. In doing so, the client might include some statements which were based upon facts not yet verified. Thus, in the instant case, Jones' statement to his attorney may well have been made in haste and without careful thought, simply to keep Charles Garry informed as to the latest in a fast-breaking series of events which might inculpate Jones. It is not clear that Jones was acting under any incentive to verify each detail he related to Garry.[2] A reasonable person in his position may only have intended to give Garry a broad overview of events. Given that the statement was made in a privileged context, it is not clear that "a reasonable man ... would not have made the statement unless he believed it to be true." Thus, the rationale for treating declarations against penal interest as reliable is not present in the instant case. Cf. *People v. Hoyos*, 573 F.2d 1111, 1115 (9th Cir.1978) (statement covered by marital communications privilege found not to meet test of trustworthiness applied to declarations against penal interest which tend to exculpate a criminal defendant).

Second, it is not at all clear that Jones' statement was against his penal interest. He did not say anything to Garry to indicate that he himself was implicated in the imminent violence at the airstrip.[3] Instead, he made remarks which tended to inculpate other members of the Peoples Temple. In doing so, his intent may well have been to deflect suspicion away from himself, and

---

**2.** Indeed, as noted *infra*, Jones may have misspoken as to the involvement of Gerald Parks in the transport of guns to the airstrip. The fact that Jones may have been careless in identifying Parks to Garry makes it all the more likely that Jones was not speaking with precision in regard to other matters referred to during this brief conversation with his attorney.

**3.** Jones' statement does establish that he was aware of the planned acts of violence before they occurred, but the mere expression of such awareness does not constitute a declaration against penal interest in the Ninth Circuit. *See* discussion of statement of Tim Carter, *infra,* and cases cited therein.

toward third parties. Certainly, a reasonable person in his position would have an incentive to falsify the statement to Garry. The rationale of the declaration against penal interest exception to the hearsay rule cannot be extended to deem reliable a self-serving statement such as this.[4] *Cf. United States v. Bailey,* 581 F.2d 341, 345–46 n. 4, 348–50 (3d Cir.1978); *United States v. Rogers,* 549 F.2d 490, 498 n. 8 (8th Cir.1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977); *United States v. Turner,* 475 F.Supp. 194, 197–203 (E.D.Mich. 1978). We thus hold Jones' statement to be inadmissible under Rule 804(b)(3).

Moreover, even if we were to find that the statement in question was a declaration against Jones' penal interest, the statement would not be admitted automatically. Having shown that the statement fell within Rule 804(b)(3) of the Federal Rules of Evidence, the government would be required to make a further showing: that the admission of the statement would not violate Layton's sixth amendment right to confront witnesses under the standard articulated in *Dutton v. Evans, supra.*

■ First, the government must make a showing of necessity. *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Again, as Jones is dead, this test is easily met.

■ Second, it must be demonstrated that the statements are reliable. Four factors are taken into account in making this determination: (1) whether the declaration contained assertions of past fact, such as might lead the jury to give it undue weight; (2) whether the declarant had personal knowledge of the identity and role of the

participants in the crime; (3) whether it was possible that the declarant was relying upon faulty recollection; and (4) whether the circumstances under which the statements were made provided reason to believe that the declarant had misrepresented the defendant's involvement in the crime. *Dutton v. Evans, supra,* 400 U.S. at 88–89, 91 S.Ct. at 219.

When the four *Dutton* factors are applied, it becomes clear that admitting Jones' statement to Garry would violate Layton's confrontation rights. (1) The statement includes express assertions of past fact such as might lead the jury to give it undue weight. (2) It is not clear that Jones had personal knowledge of the identity and role of the persons who took guns to the airstrip. He did not tell Garry that he saw them take the guns, or that he spoke with them concerning their intended acts. Moreover, it seems possible that he erroneously reported to Garry that Gerald Parks had taken weapons to the airstrip. There does not appear to be any evidence that Parks was involved in such activities. (3) Jones' statement may have been founded on faulty recollection. The fact that he appears to have incorrectly identified Parks is indicative of this. It is true that Jones was speaking very shortly after the Ryan party left for the airstrip, so recall should not have been much of a problem. But, as Jones' ramblings on the Last Hour Tape clearly indicate, he was in a highly agitated state during the Ryan visit, and during the Ryan departure in particular. His perception may well have been impaired by his excited state, and possibly by intoxicants as well. Jones' word as to who transported

4. It may be argued that our two rationales for concluding that Jones' statements are not against his penal interest are inconsistent with one another. On the one hand, we say that Jones was attempting to inform Garry of recent possibly incriminating events so that Garry could take the information into account in formulating his legal advice. On the other hand, we suggest that Jones had abandoned all efforts to be candid with Garry, and was instead attempting to conceal any involvement he may have had in the imminent violence at the airstrip. It is true that the two rationales are

inconsistent alternative views as to the statement's unreliability. But it is precisely because we have no accurate means of choosing one rationale over the other, or of rejecting them both, that we must exclude the evidence. If Jones were alive today, the jury would be able to arrive at its own conclusions as to Jones' credibility. Such a confrontation is now impossible. We find that Garry's testimony would provide the jury with an impermissibly inadequate substitute for assessing the truth of Jones' beliefs regarding Layton's involvement in the incidents at the airstrip.

the guns to the airport should not be accepted without the benefit of a rigorous cross examination of Jones himself, and that means of verifying the reliability of Jones' beliefs is, of course, unavailable now. (4) As noted above, the circumstances under which the statements were made indicate that Jones may have misrepresented Layton's involvement in the crime, putting the blame for all the airstrip activities upon Layton, even if Layton was not involved in an overall conspiracy but was instead engaged in a mission of his own design.

Accordingly, even if Jones' statement to Garry were to qualify as a statement against Jones' penal interest under Rule 804(b)(3)—and it does not—it would be inadmissible as violative of Layton's confrontation rights.

3. *The Last Hour Tape.* The government has focused attention upon a number of statements on the Last Hour Tape. Some of them appear to have been made by Jones before word came back from the airstrip that the shootings had occurred; some of them to have been made after Jones had been notified of the shootings.

The former statements include the following: "One of the people on that plane is gonna . . . shoot the pilot. I know that . . . and down comes that plane in the jungle . . . There's one man there who blames, and rightfully so, Debbie Blakey . . . for the murder of his mother and he'll sh- he'll stop that pilot by any means necessary. He'll do it. That plane will come out of the air. There's no way you can fly a plane without a pilot."

The statements which seem to have been made after word of the shootings reached Jones include the following: "The Congressman's dead, the Congressman lays dead, many of our traitors are dead, they're all laying out there dead . . . I didn't but, but my people did. My people did. They're my people. . . . I don't know who fired the shot, I don't know who killed the Congressman. But as far as I'm concerned, I killed him. He had no business coming. I told him not to come."

The government seeks to admit these statements on numerous theories.

a. *Declaration against penal interest.* Again, the requirements of Rule 804(b)(3) must be met in order for the statements to qualify as a declaration against Jones' penal interest. As noted above, the first requirement of unavailability is met. Moreover, the statements are against Jones' penal interest. They constitute an admission of criminal liability for the killings at the airstrip. However, it is not clear that the statements are reliable under the *Dutton v. Evans* standard. The full transcript of the Last Hour Tape reveals Jones as a highly agitated man with an inflated sense of self and of what he perceived to be his mission. Despite the surface import of his words, he may not have meant that he ordered the killing; he may have just meant that, once the deeds were done, he identified with the killers on a bizarre, mystical level. "They're my people . . . I don't know who fired the shot, I don't know who killed the Congressman. But as far as I'm concerned, I killed him." When he uttered these words, Jones appears to have been so disturbed that it is impossible to ascertain what he meant. Cross examination of Jones is crucial here so that the trier of fact can decide whether to accept the statements as true. Since cross examination is impossible, and yet is an essential means of assessing the truthfulness of Jones' statements, we cannot find the proferred audiotapes to be an accurate guarantor of the statements' reliability. Thus, the hearsay statements will not be admitted on the theory that they were declarations against Jones' penal interest.

Moreover, the same danger is present here as is present in regard to the statements Jones made prior to Ryan's arrival. Jones' statement that he was himself responsible for the killings is highly susceptible of being accepted by the jury as the words of a spokesman for all the gun-bearers at the airstrip, rather than as a mere link in an inferential chain leading to a conspiracy theory.

b. *State of mind.* In order for the Last Hour Tape to qualify under the state

of mind exception to the hearsay rule, it must pertain to Jones' own "intent, plan, motive, design, mental feeling, pain . . . [or] bodily health." Rule 803(3) of the Federal Rules of Evidence. The difficulty with applying this exception to Jones' statements is that the statements themselves largely concerned future or past acts of the persons at the airstrip. If admitted for the truth of the matter stated, they will enable the jury to accept as true: (1) Jones' statements as to what he believed other people were about to do; (2) Jones' statements as to what he believed other people had just done. Neither of these forms of hearsay falls within the state of mind exception. The statute specifies that the state of mind exception does not include "a statement of . . . belief to prove the fact . . . believed." *Id.* Thus, the portions of the statements just discussed are not admissible on the state of mind theory.

It is only the statements which truly reveal Jones' own state of mind that are susceptible to admission under Rule 803(3) —such as his statement "I don't know who fired the shot . . . But as far as I'm concerned, I killed him. You understand what I'm saying? I killed him. He had no business coming. I told him not to come." If these statements are admitted under the state of mind exception, the jury will be permitted to accept these statements as a true indication that Jones intended to kill Congressman Ryan. As noted in the previous section, that result is objectionable because the statements do not appear sufficiently reliable given Jones' highly agitated condition at the time the statements were made, and because they pose dangers of the sort identified in the *Shepard* case. Consequently, they are not admissible under Rule 803(3).

■ c. *Nonassertive conduct.* Here, the government argues that even if Jones did not really mean that he had intended to kill Congressman Ryan, the fact that he was saying "as far as I'm concerned, I killed him" indicates that Jones was very hostile toward the Congressman. Thus, the statements should be let in not for the truth of

the matter asserted, but as nonassertive conduct indicating hostility and relevant to the likelihood that a large-scale conspiracy was in effect. Again, we are faced with a "subtle . . . feat beyond the compass of ordinary minds." *Shepard, supra,* 290 U.S. at 104, 54 S.Ct. at 25. Because the statements are so dramatic, the chances are great that the jury will accept Jones' statements at face value, for their truth. Once the jury has done that, there are confrontation problems, as well as the danger that the jury will jump to the conclusion that Jones was serving as a mouthpiece for all the armed Peoples Temple members at the airstrip. We must acknowledge that the jury will use the statements for a hearsay purpose even if admonished not to, and, accordingly, we must be as careful about admitting the statements as we would if the statements were being openly admitted for the truth of the matter asserted. Because of the dangers posed, the statements will not be admitted as nonassertive conduct.

■ d. *Excited utterance.* An excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Rule 803(2) of the Federal Rules of Evidence. Since Jones did not have an opportunity to observe personally the shootings of which he was speaking, his statements cannot be admitted under the excited utterance exception to the hearsay rule. 6 J. Wigmore, Evidence § 1751 (J. Chadbourn rev. 1976).

■ e. *Present sense impression.* A present sense impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Rule 803(1) of the Federal Rules of Evidence. This exception to the hearsay rule is inapplicable in the present context since Jones was not a percipient witness to the shootings at the airstrip.

f. *Co-conspirator's statement.* As noted previously, three elements must be proven in order for a statement to qualify as a

co-conspirator's statement: that the declaration was in furtherance of the conspiracy; that the declaration was made during the course of the conspiracy; and that there is independent proof of the existence of the conspiracy and of the connection of the declarant and the defendant with it. In addition, the statement must be demonstrated to be reliable.

First, as to whether the statements made by Jones on the Last Hour Tape were in furtherance of a conspiracy—there are two possible conspiracies to which the government seeks to link the statements.

 One is a conspiracy to kill everyone departing Jonestown. Jones' statements simply described what may be interpreted as the aims of such a conspiracy. As discussed above, "mere conversations between coconspirators" or "merely narrative declarations" are not admissible as statements in furtherance of a conspiracy. *United States v. Eubanks, supra. See also United States v. Fielding, supra; United States v. Castillo, supra; United States v. Eaglin, supra.* Thus, under the principles articulated in the cases just cited, Jones' statements did not further a conspiracy, if any, to kill everyone departing Jonestown.

The other conspiracy which the government claims was furthered by the statements is a conspiracy to cover up conditions at Jonestown. Jones' statements do appear to have furthered such a conspiracy; they were part of a speech the object of which apparently was to exhort his followers to commit mass suicide and so prevent outsiders from interfering with the Jonestown way of life. However, Layton has not been indicted for participating in such a conspiracy. He is on trial for conspiracy to murder Congressman Leo Ryan and Deputy Chief of Mission Dwyer. The question, then, is whether it is permissible to admit against Layton statements in furtherance of a conspiracy with which he has not been charged.

There are few guidelines in this area of the law. It is clear that a criminal trial does not have to include a charge of conspiracy in order for the government successfully to invoke Rule 801(d)(2)(E) as it pertains to co-conspirator's statements. As the legislative history of the rule states:

> While ... [this] rule refers to a coconspirator, it is this committee's understanding that the rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged.

S.Rep. No. 1277, 93rd Cong. 2nd Sess. 24 (1974), U.S.Code Cong. & Admin.News 1974, pp. 7051, 7073. The case law similarly indicates that the government need only show that there was a "combination" or "joint venture" between the declarant and the defendant; it is not even necessary to show that the combination was unlawful. *See United States v. Jackson,* 627 F.2d 1198, 1216 n.35 (D.C.Cir.1980); *United States v. Trowery,* 542 F.2d 623, 627 (3d Cir.1976), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977). However, most cases in which this issue has arisen have involved uncharged conspiracies which formed the background for the substantive offenses actually charged.

As for cases directly addressing the question of the admissibility of statements in furtherance of a conspiracy separate from the crime charged, we have located only two cases on point, neither of which is completely apposite to the situation at hand. In *United States v. Postel,* 589 F.2d 862 (5th Cir.1979), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979), the charge was conspiracy to import marijuana. The evidentiary question of interest to us concerned the admissibility of the logbook from the ship allegedly used for the importation. The court first concluded that the logbook was from the ship in question and had to have been kept by one of the persons making the voyage. It then stated, "we do not, in making ... [the] determination [that the logbook is admissible under the co-conspirator exception], assume the conclusion that we are seeking to reach—that a conspiracy existed when the boat was purchased—*because it is not necessary that the conspiracy upon which admissibility of the*

*statement is predicated be that charged.* Moreover, the agreement need not be criminal in nature. . . . It is clear to us that the voyage was a 'joint venture' in and of itself apart from the illegality of its purpose and that the logbook was therefore admissible as non-hearsay under the rule." *Id.* at 886 n.41 (emphasis added).

The second case, *United States v. Cambindo Valencia,* 609 F.2d 603 (2d Cir.1979), *cert. denied sub nom Prado v. United States,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980), involved a narcotics-related conspiracy. In that case, the declarant and the defendant had apparently been connected by the evidence to an uncharged drug conspiracy. The statements in question pertained to that conspiracy but would have shed light on the drug conspiracy with which the defendant was charged. The court commented,

> One point not specifically discussed in the . . . line of cases [following *United States v. Geaney,* 417 F.2d 1116 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970) ] or in the commentaries is whether the coconspirator exception permits admission of otherwise hearsay statements made by a declarant against a defendant, neither of whom is connected with the conspiracy actually charged or proved, but both of whom are participants in another conspiracy found to exist in the factual pattern of the case. The rationales generally advanced in support of the coconspirator exception, including the "agency" theory and the unusual need for relaxed evidentiary rules to prove conspiracies that frequently involve well-concealed concerted activities, *see generally* Davenport, *The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis,* 85 Harv.L.Rev. 1378, 1384–85 (1972), offer scant guidance. Wigmore's basic raison d'etre for hearsay exceptions, that there are satisfactory in-

dependent indicia of reliability supporting admission of the hearsay, does not apply to the coconspirator exception and therefore provides no basis for drawing any conclusion. The language of Fed.R.Evid. 801(d)(2)(E) is also of little help, with its elliptical reference to "the conspiracy."

> We are inclined to the narrower construction of the rule, limiting the admission of hearsay statements only to those made by coconspirators of the conspiracy charged or proved. In this way, the trial judge can avoid a time-consuming and potentially confusing determination, for each hearsay statement offered, of whether the declarant and party against whom the statement is offered, are members by a fair preponderance of the independent evidence not only of the conspiracy at issue but of other conspiracies neither charged nor proved. Under the narrow construction, to be sure, a temptation may be presented to widen conspiracy indictments to include any and all declarants whose statements may be useful in proving the actual conspiracy. But careful trial court supervision, coupled with proper appellate review, should be sufficient to guard against this event.

*United States v. Cambindo Valencia, supra,* 609 F.2d at 635–36 n.25.

▮ Although the *Cambindo Valencia* case is not directly on point, we have decided to follow the lead of the Second Circuit and opt for a narrow construction of the co-conspirator exception, allowing in coconspirator statements only if they are in furtherance of the conspiracy charged or, in those cases where a conspiracy has *not* been charged, in furtherance of the conspiracy which underlies the substantive charges. Unlike many other exceptions to the hearsay rule, the co-conspirator hearsay exception is not based upon the inherent reliability of statements. Rather, it is based on the legal fiction of agency.[5] Moreover, it is

---

5. We have no doubt that in the federal courts, the "in furtherance of" requirement remains viable, and we believe that this is as it should be. "The agency theory of conspiracy is at best a fiction and ought not to serve as a basis for admissibility beyond that already established." Advisory Committee's Note to *Proposed* Fed.R.Ev. 801(d)(2)(E). *See generally, Developments in the Law—Criminal*

supported by the realization that without such evidence it would be difficult to prove conspiracy. Both these reasons seem to suggest that the exception should be confined to the conspiracy charged or underlying the substantive charge. Such a limitation will result in the inclusion of co-conspirator statements relating directly to the criminal conspiracy in question, and the exclusion of a broader swath of potentially unreliable testimony. Thus, we conclude that Jones' statements, offered under the theory that they were in furtherance of a conspiracy to cover up conditions at Jonestown, are inadmissible.

Since the statements fail the initial test of admissibility, we need not consider whether they occurred during the pendency of a conspiracy, or whether there is independent proof that Jones and Layton were connected to a conspiracy. We also need not reach the question of reliability under the Confrontation Clause. We do note, however, that in considering whether the Last Hour Tape qualifies as a declaration against penal interest, *supra,* we concluded that serious questions as to the reliability of Jones' statements preclude their admissibility on that theory. The same reasoning would, of course, apply if we were to reach the question of reliability in connection with the admissibility of the Last Hour Tape as a co-conspirator statement.

■ g. *Dying declaration.* There is no evidence that Jones believed his own death was imminent when he made the statements in question. He apparently did not take poison, as did his followers, but instead died of a gunshot wound. Consequently, his statements were not dying declarations within the meaning of Rule 804(b)(2) of the Federal Rules of Evidence. Moreover, even if we were to assume that Jones intended to commit suicide, and even if we were to interpret such an intent as a belief that his death was imminent, Jones' statements did not "concern . . . the cause or circumstances of what he believed to be his impending death." *Id.*

*Conspiracy,* 72 Harv.L.Rev. 920, 984–86 (1959).

4. *Statement of Tim Carter to Gerald Parks.* On November 18, 1978, Peoples Temple member Tim Carter had a conversation with Gerald Parks in Georgetown. In the course of that conversation, Carter acknowledged that he had been sent by Jones to the Bay Area, to infiltrate the Concerned Relatives group. His mission was to determine which of them were coming to Jonestown with Congressman Ryan, and what their aims were in coming.

The government seeks to introduce Carter's statements through the testimony of Gerald Parks. It is offered for the truth of the matter asserted, as a declaration against Carter's penal interest. As stated above, in order for the statements to qualify under Rule 804(b)(3), the government must show that the declarant is unavailable and that the statement is against penal interest.

■ In this instance, the declarant is not dead. Carter is alive, but has indicated to the government that he will exercise his right to remain silent if called as a witness. A declarant who is "exempted by ruling of the court on the ground of privilege from testifying" is unavailable within Rule 804(a)(1) of the Federal Rules of Evidence. But Carter has "never expressly asserted the privilege. Because the rule requires a finding of unavailability, an express claim of privilege and a ruling thereon should be made" in order for the statement to qualify as a declaration against penal interest. *United States v. Oropeza,* 564 F.2d 316, 325 n.8 (9th Cir.1977), *cert. denied,* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978). The foregoing dictum indicates that the government may not have made a sufficient showing of unavailability as to Carter. However, we need not decide this question because of our conclusion that the statement fails to meet the second statutory test—that of being sufficiently against Carter's penal interest to qualify as an exception to the hearsay rule.

*United States v. Moore,* 522 F.2d 1068, 1077 n.5 (9th Cir.1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976).

As the Ninth Circuit has noted, "While the reach of Rule 804(b)(3) is not limited to direct confessions of criminal responsibility ... the declarant's statements must, in a real and tangible way, subject him to criminal liability." *United States v. Hoyos, supra,* 573 F.2d at 1115 (*citation omitted*). Since the enactment of Rule 804(b)(3) in 1975, the statements which the Ninth Circuit has found to be against the declarant's penal interest have been rather explicit admissions of criminal liability. For example, in *United States v. Benveniste,* 564 F.2d 335 (9th Cir.1977), the statements which were held admissible directly implicated the declarant in criminal activity. The defendant had been convicted of conspiracy to distribute cocaine. He sought to introduce statements which tended to exculpate him. The declarant, Meek, refused to testify on fifth amendment grounds. Consequently, Benveniste offered Meek's statements through the testimony of LaJeunesse, a witness to the remarks, on the theory that they were against Meek's penal interest. The court held that the statements were, in fact, admissible on that theory, reversing the district court. The statements themselves appear to have been quite explicit as to Meek's knowing involvement in criminal activity:

> Meek's statements to LaJeunesse implicate her as a key participant in a major drug sale negotiation. If Meek had been charged with conspiracy to sell cocaine her statements would show she knowingly played an active role in bringing Tabb, Wyman and appellant together and that she had detailed and intimate knowledge of the transaction.

*Id.* at 341.

Similarly, in *United States v. Satterfield,* 572 F.2d 687 (9th Cir.1978), *cert. denied,* 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978), the court noted in dictum that statements sought to be admitted by the defendant were against the declarant's penal interest where the declarant had said, *inter alia,* "that he did not want to ... send his 'crime partner' to jail." *Id.* at 690. The court ultimately held that the statements were untrustworthy, and so were inadmissible.

*See also United States v. Boyce,* 594 F.2d 1246, 1248–49 (9th Cir.1979), *cert. denied,* 444 U.S. 855, 100 S.Ct. 112, 62 L.Ed.2d 73 (1979).

The statement of Tim Carter was not as direct a statement of criminal liability as were the statements found to be declarations against penal interest in the cases just discussed. Carter's statements did not "implicate ... [him] as a key participant in a crime," nor indicate that he had "detailed and intimate knowledge" of a crime. *Benveniste, supra,* 564 F.2d at 341. Carter did not reveal that he regarded himself as anyone's "crime partner," as the declarant in the *Satterfield* case had done. Instead, he simply noted that he had been sent by Jones to the Bay Area to investigate the activities of the Concerned Relatives. This was not an illegal activity in itself, as were the admitted actions of the declarants in the cases discussed above. Moreover, he did not implicate himself by indicating that he knew of any plans to do violence to the Concerned Relatives or to other members of their party.

Thus, his statements are similar to those of the declarant whose statements were found not to have been against her penal interest in *United States v. Poland,* 659 F.2d 884 (9th Cir.1981). There, the defendant had sought to introduce the statement of one Sylvia Brown, who had claimed her fifth amendment privilege, through the testimony of a private investigator who had heard Brown's statement. The court held the statement inadmissible, noting:

> The statement of Sylvia was not a confession of any crime by her, nor did she say that she actually did anything criminal. She was present at planning. Her statement is that of an observer, not a participant. On the basis of her statement, the *most* that she did was to conspire and there is little evidence of that. All she says she did was to give Severson a false identification card in the name of Harris, but she does not relate that to any use of the card nor to any object of the conspiracy, nor to any knowledge on her part of what the card would be used

for. In other words, her statement is not "solidly inculpatory" of her. *See United States v. Hoyos,* 573 F.2d 1111, 1115 (9th Cir.1978).

*United States v. Poland, supra,* 659 F.2d at 895. Similarly in his statement, Carter did not confess any crime, nor say that he had done anything criminal, nor relate his acts to a conspiracy to do violence to the Ryan party or to any knowledge on his part as to what use was to have been made of the information he gathered in the Bay Area. Thus, we find that Carter's statements were not solidly inculpatory, and so cannot be admitted as a declaration against Carter's penal interest.

Moreover, even if we were to find that Carter's statement was against his penal interest, the government would still have to demonstrate that the admission of the statement would not violate Layton's rights under the Confrontation Clause. *Dutton v. Evans, supra.*

In order to make this showing, the government must first establish that it is necessary to introduce the evidence through a hearsay source—that is, that Carter is unavailable despite the government's good faith efforts to procure his attendance at trial. *Ohio v. Roberts, supra,* 448 U.S. at 74–75, 100 S.Ct. at 2544. It is unclear whether such good faith efforts must include granting a declarant immunity so that his or her testimony will be available at trial—a step the government has declined to take in connection with Carter's statement.

However, we need not decide whether it is necessary to present Carter's statement through hearsay testimony, because we find that the statement fails to meet the second test under the Confrontation Clause, that of reliability. The danger that a jury will not be sufficiently critical of a hearsay statement is particularly acute where the statement includes express assertions of past facts, as did Carter's statement to Gerald Parks. *See Dutton v. Evans, supra.* Because of the likelihood that, in the absence of cross examination, the jury would lend Carter's statement undue weight, it is inadmissible as violative of Layton's confrontation rights.

5. *The Sukhdeo materials.* Dr. Hardat Sukhdeo, Chief of Psychiatry at Jersey Medical School in New Jersey, interviewed Layton within a short period of time after the shootings, and then again within a year of the shootings. He was retained by Layton's Guyana defense attorneys for those purposes. All tapes and reports concerning the interviews fell within the attorney-client privilege. *See United States v. Palmer,* 536 F.2d 1278, 1281 (9th Cir.1976); *United States v. Alvarez,* 519 F.2d 1036 (3d Cir.1975); *United States v. Gurtner,* 474 F.2d 297, 298 (9th Cir.1973).

. At the Guyana trial of Layton, Dr. Sukhdeo testified generally as an expert on cult psychology. To the extent he did testify as to Layton's mental state, he only spoke briefly of Layton's period of amnesia after the crime. In our previous trial of Layton in the United States, we considered the question whether Sukhdeo's testimony in Guyana constituted a waiver of the attorney-client privilege protecting the Sukhdeo materials. We concluded that it did not, since Sukhdeo did not reveal a significant portion of his privileged communications with Layton. *United States v. Layton,* 90 F.R.D. 520 (N.D.Cal.1981).

In the previous trial of Layton in this court, the government sought a ruling that if the defense presented the expert testimony of any mental health professionals, the government should be able to ask the experts whether they had relied on the Sukhdeo materials in arriving at their diagnoses of Layton. The government reasoned that if the experts *did* rely on the materials, they were subject to full cross-examination on the issue. If the experts did *not* rely on the materials, the jury was entitled to take that factor into account in assigning weight to the experts' testimony. We disagreed with the government's position.

It is true that if a defense expert has relied on the Sukhdeo materials, the expert can be fully cross examined on them, because "it is important that the jury know

upon what facts the expert witness bases his conclusion." *United States v. Harper,* 450 F.2d 1032, 1037 (5th Cir.1971). *See also United States v. Preciado-Gomez,* 529 F.2d 935, 942 (9th Cir.1976), *cert. denied,* 425 U.S. 953, 96 S.Ct. 1730, 48 L.Ed.2d 197 (1976); *United States v. Davila-Nater,* 474 F.2d 270, 282–84 (5th Cir.1973), *reh. denied,* 474 F.2d 1348 (5th Cir.1973). However, this principle does not dispose of the issue in the present case, since none of the experts whom the defense has indicated it may call as witnesses will have relied upon the Sukhdeo materials in forming an opinion.

■ Given that that is the case, it is our opinion that no mention of the Sukhdeo materials should be made in the presence of the jury. Mentioning the Sukhdeo materials would be the equivalent of mentioning a missing witness. Missing witnesses are, of course, routinely mentioned in federal courts; the judge is even permitted to instruct the jury that it may draw an adverse inference from the absence of certain witnesses. *See, e.g., United States v. Bautista,* 509 F.2d 675, 678 (9th Cir.1975), *cert. denied sub nom Monsivais v. United States,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). *See also* Vol. 1, E. Devitt & C. Blackmar, Federal Jury Practice and Instructions, § 17.19 (3d ed.1977). That is the general rule. However, a different rule is evolving where the missing witness is one who has engaged in privileged communications with a criminal defendant. The Fifth Circuit is in the vanguard of this trend. On several occasions, that court has noted that it is improper for the government to call attention to the fact that the defendant's wife has not taken the stand. To allow the government to call attention to the absence of the wife is to create the risk that the jury will begin to speculate as to why the wife did not testify and will conclude that the reason is that the wife's testimony would have inculpated the defendant. Such a result has been deemed by the Fifth Circuit to be an impermissible burden upon the spousal privilege.

Calling attention to the absence of the defendant's spouse has sometimes been held to be harmless error in the Fifth Circuit, but not when the error goes to "the very heart of ... [the] defense," as in *United States v. Smith,* 591 F.2d 1105, 1112 (5th Cir.1979). There, the defendant, charged with possession of firearms by a convicted felon, claimed that all the weapons found in his residence were actually in the possession of his wife. During closing argument, the prosecutor called attention to the fact that Mrs. Smith had not been called to testify in support of this defense theory. The trial judge overruled the defendant's objections to these comments by the prosecutor. The appellate court stated:

> Without question the argument of the prosecutor and the ruling by the court constituted error. The principle as stated in *United States v. Parr,* 516 F.2d 458, 471 (5th Cir.1975) that "[f]ailure to produce a favorable witness peculiarly within a party's power creates an inference that his testimony would be unfavorable" does not apply to the spouse of the defendant. This is the clear effect of our most recent cases.... The rule applied in these cases is an extension of the protection afforded by the personal privilege that a non-party spouse not be required to give testimony.

> We have recognized, however, that a violation of the rule does not require automatic reversal. The government correctly points out that in cases presenting related questions we have held that error, if any, was cured by appropriate instructions. *See United States v. Sheriff,* 546 F.2d 604 (5th Cir.1977). We have also indicated that when such an error occurs the conviction may be upheld if the error appears from the record to have been harmless....

> We ... cannot conclude that the error was cured by an appropriate instruction. Indeed, it was clearly compounded.

> It is equally impossible to conclude that the error was harmless. The bottom line of the only argument that defendant could make was that the guns were in his wife's possession. This was the very heart of Smith's defense. We cannot say

under these circumstances that the prosecutor's improper argument was harmless. *United States v. Smith, supra,* 591 F.2d at 1111–1112 (*citations omitted*).

This rationale applies in the Layton case as well. Allowing references to missing defense experts would impermissibly burden the attorney-client privilege, both making attorneys more reluctant to retain defense experts and making defendants more reluctant to be candid with any experts retained by the defense. *Cf. United States v. Alvarez, supra,* 519 F.2d at 1045–1047.

Moreover, if at retrial the Layton team were to present the testimony of expert witnesses and the government were permitted to mention the Sukhdeo materials in the presence of the jury, the error would go to the heart of the defense. The fact that the defense team was presenting expert testimony as to Layton's mental state would mean that it was pursuing a defense theory of insanity or diminished capacity. If Dr. Sukhdeo were mentioned to the jury, the jury would begin to speculate that the defense team did not put Dr. Sukhdeo on the stand because Sukhdeo would have testified that there was nothing wrong with Layton. This sort of speculation would be highly prejudicial to the defendant, and would severely undercut the mental defense theory he would be trying to construct. While such governmental tactics are certainly permissible where nonprivileged information is available for impeachment purposes, they should not be encouraged where privileged information is in issue. Accordingly, if at retrial the defendant presents the testimony of experts who have not relied on the Sukhdeo materials, the government will not be permitted to mention those materials in the presence of the jury.

For the foregoing reasons, the government's motion under Rule 12(d) of the Federal Rules of Criminal Procedure is denied in its entirety.

SO ORDERED.