UNITED STATES of America,

v.

**Bruno MANNELLO.**

**Crim. No. 84–00176.**

United States District Court, E.D. Pennsylvania.

Dec. 12, 1985.

Vickers individually. There is no evidence that the transaction was designed to benefit the corporation.

Edward S.G. Dennis, Jr., U.S. Atty., Richard Scheff, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

Nino Tinari, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Defendant Bruno Mannello was convicted of offenses stemming from the theft and distribution of several million dollars worth of food stamps. Presently before the court are his post-trial motions. For reasons that follow, these motions will be denied.

Mannello contends that there was insufficient evidence to support a conviction on count eleven of the indictment, which charged an unlawful distribution of food stamps having a face value of $558,500.

In evaluating this contention, I must view the evidence in the light most favorable to the government, drawing all reasonable inferences from that evidence in the government's favor, and am required to uphold the verdict unless no rational jury could conclude beyond a reasonable doubt that the government had proved the charge in the indictment.

Viewed against these principles, defendant's argument must fail.

Initially, there appears no real question that the government showed an illegal distribution of food stamps took place on the date in question, April 6, 1984. Rather, defendant's contention focuses on a claimed insufficiency of evidence that Mannello was involved.

Michael Kakas, who was the master-mind of the food stamps theft, testified that the April 6, 1984 distribution was the third in a series of contemporaneous distributions initiated by Kakas with Frank Hutchinson, another defendant. Kakas was to drop off a commercial truck at the Penn-Warren club to allow Hutchinson to have it loaded with food stamps. N.T. at 41–43 (June 27, 1984). After the truck had been left in the assigned location, 25 boxes of food stamps were found in the truck. *Id.* at 43.

While there was no eyewitness testimony as to who loaded the boxes on the truck, there was sufficient circumstantial evidence to support Mannello's conviction on this count. First, there was evidence that food stamps were stored at the Villa Sorrento, a restaurant owned by Mannello, and that Mannello had access to them. Particularly probative of this point is John McDonnell's testimony that on two occasions at the Villa Sorrento, Mannello provided him with food stamps to sell. N.T. at 165–66, 172 (June 29, 1984). Furthermore, Michael Kakas testified that he was told by Hutchinson that Mannello was laundering the proceeds from food-stamp sales and that Mannello was selling food stamps. N.T. at 106 (June 26, 1984).

More important, the government showed that Mannello participated in other contemporaneous and similar distributions by Hutchinson, and that the Villa Sorrento served as a storage facility for the Hutchinson distributions. Kakas testified that he had obtained stamps from Hutchinson on two occasions in the two weeks prior to the April 6, 1984 distribution. N.T. at 31–33, 37–39. Kakas testified that he left his truck at the Queen Ann Shopping Center so Hutchinson could get it, load it, and return it to him with the food stamps. *Id.* On both of these occasions, Kakas returned to the truck to find the food stamps he had ordered. *Id.*

Thomas J. Weidman, a special agent of the FBI, testified that he was assigned to observe the two distributions. He said that both times he saw Kakas leave his truck at the shopping center, and that another individual then took it from the shopping center. *Id.* at 90–92, 95–97. Both times, the truck was backed to the rear doors of the

Villa Sorrento, where the driver and Bruno Mannello unloaded boxes from the restaurant and placed them in the truck. *Id.* at 93–94, 97. The truck was then returned to the shopping center where it was reclaimed by Kakas. *Id.* at 94–95, 97. Agent Weidman's identification of Mannello was corroborated by Kakas' testimony that, upon review of a surveillance film of the first distribution, one of the individuals loading boxes was Bruno Mannello.

Even though there was no direct eyewitness testimony concerning the April 6, 1984, distribution, it is clear from the foregoing that the jury could reasonably conclude that Mannello was a participant in that distribution. The jury reasonably could have found that Mannello was involved in light of his prior involvement in other distributions, the direct eyewitness testimony concerning his participation in two relatively contemporaneous and similar distributions, and the testimony concerning the use of the Villa Sorrento as storage facility for the food stamps.

There is thus no merit to defendant's first argument.

■ Defendant next contends that I erred in refusing to allow government witness John McDonnell to be cross-examined about his alleged status as a Navy deserter. In his post-trial brief, defendant claims that a restriction of this nature deprived him of the opportunity to bring the witness's motivation to the jury's attention.

Defendant's argument is specious.

Although counsel was restricted at one time, the government later withdrew its objection and allowed full inquiry into McDonnell's status with the Navy. *See* N.T. at 197–205, 218–19 (July 2, 1984). McDonnell was asked whether he joined the Navy. *Id.* at 202. He was then asked whether he was still in the Navy, and, if not, under what conditions he was discharged. *Id.* at 202. McDonnell explained that some confusion surrounded his discharge: although he thought he had been honorably discharged, there was a problem with his records. *Id.* at 202. Counsel then asked McDonnell whether he was a deserter or whether the Navy considered him to be a deserter. *Id.* at 203. McDonnell was questioned about this legal relationship with the Navy. *Id.* He was asked whether he was on legal hold, *id.* at 200–01, 202, and whether the government arranged to get him out of legal hold. *Id.* at 203. It is therefore readily apparent that counsel was given a complete opportunity to bring before the jury the facts that he complains he was not allowed to explore.

Defendant cannot support an argument that he was prejudiced by not being able to develop at the optimal *time* the existence of the Navy detainer. The requested cross-examination was not relevant to the subject matter on which his counsel was questioning when he was restricted. Counsel had been asking McDonnell about the circumstances surrounding his surrender to the authorities, and, in particular, was focusing on the statement he gave them. *Id.* at 128–38. This statement was given *before* the authorities learned that McDonnell was a Navy deserter. *Id.* at 139. Thus, the subsequent information about the Navy's wanting McDonnell was irrelevant to show that McDonnell had a motive to provide a false or misleading statement, and could not properly be elicited by cross-examination.[1] *Cf. United States v. Benavidez*, 664 F.2d 1255, 1262 (5th Cir.), *cert. denied*, 457 U.S. 1121, 102 S.Ct. 2936, 73 L.Ed.2d 1334 (1982) (neither abuse of discretion nor violation of right to confrontation for trial court

---

1. The only offer made by counsel that arguably would even raise a right to cross-examine was counsel's statement that the cross-examination would prove his "[m]otivation for him to come in here, he's explaining what he did, telling what happened on the food stamps." N.T. at 141 (July 2, 1984). First, the context of that statement makes it unclear whether counsel, by the use of the phrase "in here," meant "in the courtroom," or "in the police station." Second, even assuming that counsel meant "in the courtroom," the motivation that must be brought to the attention of the jury was not the witness' motivation merely to testify but rather his motivation to testify falsely. In any regard, the evidence ultimately was in fact brought to the jury's attention.

to have precluded defense counsel from using for impeachment purposes the fact of an arrest of a witness which took place after the witness had agreed to testify).

■ Finally, defendant contends that I erred in permitting McDonnell to testify as to what he meant in a conversation with Mannello by the term "moving specific amounts." The government offered to the jury a recording of a conversation between McDonnell and Mannello which took place after McDonnell had talked with police officers about his involvement in the illegal distribution of food stamps. In pertinent part, the recorded conversation was as follows:

JM: He said I'm goin' to jail for a lotta years.

BM: Why?

JM: He didn't, he didn't, he wouldn't tell me. He wouldn't tell me any specifics about anything.

BM: They can't prove anything to you.

JM: He mentioned, ah, . . . he mentioned amounts that I supposedly moved.

BM: Were they actual amounts?

JM: Yeah. He said, 'Five and then a hundred.' I'm scared to death, man. What am I supposed to do?

N.T. at 197–98 (June 29, 1984). McDonnell continued by saying,

I don't know. Ya know the fact that, ah . . . they don't, they don't, ah . . . you know that they didn't arrest me is, is one thing, but man I'll tell you what, some of [what] they said is a little close. I mean just a little too close . . . is they know. They know somethin', . . . . Ya' know, where I'm concerned. Okay, they know something', they know, they know a lot. Ya know, how much they wouldn't tell me. They wouldn't say, 'Well we know

you did this' 'or' 'we know you did that.' But the fact of the amounts ya know. *Id.* at 204.

Over objection, McDonnell testified that when he referred to moving specific amounts he meant food stamps. *Id.* at 205.

It was not error to allow this testimony.[2] Although reference at trial was made to Fed.R.Evid. 803(3), this hearsay rule is inapplicable because the evidence sought to be excluded was not an out-of-court statement. Therefore, the only conceivable basis for objection to this evidence was Fed.R.Evid. 403. Under a Rule 403 analysis, it is clear that the probative value of McDonnell's testimony outweighed any prejudice to the defendant.

McDonnell's in-court statement showed his intent when he spoke to Mannello. This evidence was relevant in two related respects. First, it allowed the jury to understand the subject matter of the conversation. Second, and more important, McDonnell's intent as to the meaning of a term he used during the conversation is probative of Mannello's understanding of the term. This understanding, in turn, was essential for the jury to appreciate Mannello's reaction to McDonnell's statements.

The meaning one party to a two-party conversation attributes to his own vague phrase is probative of the other party's understanding of that phrase. The probative value is particularly great where the conversation is somewhat extended, takes place between individuals who know one another, and the response by the listener fails to indicate uncertainty as to the speaker's meaning.

The prejudice to defendant was the risk that the jury would have believed that McDonnell's statement was a direct attestation of Mannello's understanding of the term.[3] Any confusion in this regard could

**2.** For an example of a case allowing this type of testimony, *see United States v. Newman,* 733 F.2d 1395, 1402 (10th Cir.1984).

**3.** Even if McDonnell had been asked his opinion about what Mannello understood by the term, the evidence would have been admissible. "Specific amounts" has no clear meaning.

McDonnell's opinion would have been based on his direct perception, would not have been speculative, and would have been helpful to the jury's determination of Mannello's involvement in the alleged offenses. *See United States v. DePeri,* 778 F.2d 963, 977 (3d Cir.1985).

52

have been eliminated either through cross-examination of McDonnell or by eliciting from Mannello his understanding of the term. Counsel chose the latter and Mannello testified that the conversation referred to Scotch whisky rather than food stamps. N.T. at 99 (July 5, 1984).

Because I conclude that the probative value outweighed the prejudicial danger to the defendant, the evidence was properly admitted.[4]

In short, there was no error and Mannello is not entitled to a new trial.

---

**4.** This case is distinguishable from the case cited by defendant, *United States v. Layton*, 549 F.Supp. 903 (N.D.Cal.1982). First, *Layton* was concerned with hearsay problems, which are not present here. Second, *Layton*, involved an address given to a cult membership rather than a face-to-face conversation. Finally, in *Layton*, the government attempted to do more than establish the listeners' understanding. In *Layton*, the prosecutor wished to show that the plans harbored by the speaker were also harbored by the listeners—a logical process that would require both understanding *and* adoption.